DOE v. NORTHWESTERN COAL & TRANSPORTATION CO. et al.

(Circuit Court, D. Oregon. December 21, 1896.)

No. 2,156.

1. CORPORATIONS—POWER OF DIRECTORS—SALARIES TO OFFICERS—PAST SERVICES.
The by-laws of the N. Co., as originally adopted, provided that the officers, including the president, should receive no compensation, and also provided for a general superintendent, who was to supervise the company's business generally and in detail, and was to be paid a salary. Subsequently, the by-laws were amended by reducing the number of directors, abolishing the office of general superintendent, and providing that the president should have general charge of the business of the company. The president acted under these by-laws for five years, though he paid no attention to the details of the business or its active operations, and during this time made no claim for compensation. At a .meeting of the directors, at which only the president, his son, and his clerk were present, it was resolved to pay the president a salary for the future, and also for the five years during which he had already acted, and notes were issued to the president for such salary, for which new notes, secured by mortgage, were afterwards issued, upon the vote of a majority of the directors, made up of the president himself and a person to whom he had assigned most of the notes. *Held*, that the directors had no power to bind the corporation to pay for the president's services, and the notes, as between the president and the corporation, were void.

2. BILLS AND NOTES—HOLDERS FOR VALUE.
In the federal courts, one who takes negotiable paper, before maturity, as collateral security for an existing debt, is a holder of such paper for value.

3. SAME—SUSPICIOUS CIRCUMSTANCES—DUTY OF INQUIRY.
It is not the rule, in the federal courts, that one who takes negotiable paper, before maturity, with knowledge of facts which would put an ordinarily prudent man upon inquiry as to its validity, is chargeable with notice of all facts which such inquiry would disclose; but, unless he has willfully closed his eyes to facts which would show defects in the paper, he is entitled to be regarded as a bona fide purchaser.

4. CORPORATIONS—LIABILITY OF OFFICERS—NEGLIGENT MANAGEMENT.
The president of the N. Co., while in control of the corporation, sold large quantities of the coal produced by that company to a firm in which he either was a member, or was very closely interested, through his sons, who managed

it; **and** did not require such firm, though it sold the coal at a large advance, to pay for it, but allowed such firm to incur a very large debt to the N. Co., which was ultimately lost through the insolvency of the firm. *Held*, that such action of the president amounted to such gross negligence as to charge him with the whole amount which the corporation had thereby lost.

**5. SAME—INSOLVENCY—MORTGAGES.**

A creditor of a corporation is not prevented from taking a mortgage on its assets, to secure his debt, by the fact, or by his knowledge of the fact, that the corporation is insolvent; nor does such fact render the mortgage invalid.

**6. SAME—CREDITOR WITH COLLATERAL SECURITY.**

A creditor of a corporation, who holds collateral security for his debt, cannot be compelled to exhaust such security, before resorting to the general assets of the corporation for payment.

**7. SAME—STOCK ASSESSMENTS—PRESUMPTION OF PAYMENT.**

Where it appears that the full amount of the par value of the stock of a corporation has been assessed, and the time for payment of the assessments has expired, it will be presumed, in the absence of a showing to the contrary, that the full amount of the par value of the subscribed stock has been paid.

**8. RECEIVER'S CERTIFICATES—PAYMENT — COURTS OF PRIMARY AND AUXILIARY JURISDICTION.**

When an issue of receiver's certificates has been authorized by the court in which a suit ancillary to the principal suit in which the receiver was appointed is pending, the court of primary jurisdiction will remit to such court the matter of ordering the final payment of the certificates, and determining what sums are due on them, together with the compensation of the receiver.

**9. SAME—LIEN—PRIVATE CORPORATIONS.**

Receiver's certificates, issued by the receiver of a merely private corporation, are not a charge upon the assets of the corporation in preference to existing liens, as against lienors who have not consented to their issue.

R. E. Houghton and Wirt Minor, for complainant.

Thomas N. Strong, for defendant Farrell.

Alex. Bernstein, for defendant A. J. Knott.

J. W. Whalley, in pro. per.

S. H. Gruber, for defendant corporation.

J. N. Dolph and W. S. Beebe, for defendant Coulter.

GILBERT, Circuit Judge. The Northwestern Coal & Transportation Company was incorporated under the laws of the state of Oregon in the year 1885, with a capital stock of $72,000, consisting of 720 shares of $100 each. By the by-laws of the corporation the officers thereof consisted of a board of five directors, a president, a vice president, a treasurer, and a secretary. The by-laws provided also for a general superintendent, whose duties were prescribed. By the by-laws neither the president, vice president, treasurer, nor any of the directors were to receive any compensation for their services, and the salaries of the secretary and superintendent were to be fixed by the stockholders at a regular meeting thereof. At the time of the incorporation of the company the salary of the superintendent was fixed at $200 per month, and so remained until December 5, 1887, when the by-laws were rescinded, and new by-laws were adopted, changing the number of the directors from five to four, vacating the offices of vice president and superintendent, and giving the president, in addition to the duties which he had theretofore exercised, the general charge and supervision of all the business of the company. From that time until the commencement of the present suit the defendant Samuel Coulter was the president

of the corporation. No mention was then or thereafter made, in any of the meetings of the stockholders or of the directors, of the salary of the president, nor was he allowed or paid any salary until the year 1893. Of date January 7, 1893, the following appears in the records of the directors' meetings:

"Whereupon Mr. Samuel Coulter stated to the board that he had for several years been performing the duties of a superintendent of the company's business, and that he deemed it but just that he be compensated for such services; that the company has paid $200 a month to the former superintendent, but that he would ask that he be allowed only $150 per month."

Upon this statement two resolutions were adopted, one allowing the president of the company $150 per month as compensation for services as superintendent during the ensuing year, the other allowing him a like sum per month for services during the years 1889, 1890, 1891, 1892. In June, 1892, the defendant Farrell had indorsed a note for Coulter to the amount of $775, and in September, 1893, had signed jointly with him two notes, one for $6,000 and one for $250. On October 7, 1893, at a meeting of the board of directors, at which Samuel Coulter, A. S. Coulter, his son, and W. T. Hume were present, a resolution was unanimously adopted reciting that the company was indebted to Samuel Coulter for services as superintendent for the years 1889, 1890, 1891, 1892, up to October 7, 1893, $8,550, and for moneys advanced to pay wages of employés, supplies, and powder bills, $1,500, and directing the president and secretary to execute and deliver to said Coulter the notes of the corporation for the total amounts so due him. Under the authority of said resolution promissory notes were issued in various sums aggregating the amount so authorized. Among said notes was one for $1,000, which was afterwards indorsed to the defendant J. W. Whalley; and one for $400, which was subsequently assigned to the defendant A. J. Knott. The remainder, amounting to about $7,000, were indorsed to the defendant Farrell. On June 26, 1894, at a meeting of the board of directors, then consisting of Samuel Coulter, president, the defendant Farrell, and Wirt Minor, the defendant Farrell offered a resolution that the question of the validity of all of said notes (the same being then unpaid and due) be submitted to Mr. Joseph Simon for his opinion. Such opinion was accordingly obtained and submitted, sustaining the validity of the notes. Thereupon a resolution was offered that new notes be executed for the amounts due upon said former notes, and that mortgages be made to secure the same. Directors Coulter and Farrell voted in favor of the resolution, and director Minor against it. The new notes, secured by the mortgages upon the company's property, were executed and delivered pursuant to the resolution. The defendant Knott refused to accept the mortgage which was executed in his favor, and he brought an action against the corporation, and obtained judgment by default for the sum of $400, with interest thereon from October 7, 1893, together with costs and attorney's fees.

The complainant's testator, John S. Doe, of San Francisco, Cal., became the owner of 559 of the shares of the stock of said corporation on or about July 5, 1888, and owned the same until the time of

his death, in the year 1894. During the same period the defendant Coulter owned 160 of said shares. The object of the present suit is to require the defendant Coulter to account for large sums of money advanced to him for the corporation by the said John S. Doe in his lifetime, and to obtain a decree winding up said corporation, and disposing of the assets thereof, and setting aside as illegal and invalid the said promissory notes and mortgages to the defendants Farrell and Whalley, and the judgment obtained by the defendant Knott.

Upon the issues made in the suit the cause was referred to the examiner of this court to take testimony, and, as a special master, to make and report findings of fact, but not conclusions of law. Exceptions are now made to the findings of fact on behalf of all the parties, and the questions for present determination are: First, which of the exceptions shall be allowed, if any, to the findings of fact? and, second, what are the proper conclusions of law to be deduced from the facts in the case? In determining whether the notes and mortgages in favor of the defendants Farrell, Whalley, and Knott are the valid obligations of the company, the first question to be considered is whether or not the company was justly indebted to the defendant Coulter on account of the salary and the disbursements which were the consideration of its notes to him. It is evident that the change in the by-laws, made in December, 1887, whereby the office of general superintendent was abolished, and the number of the officers of the corporation was reduced, was for the purpose of curtailing the expenses of the corporation, and that it was intended that thereafter the duties of the general superintendent should be discharged partly by the president, but chiefly by certain subordinate employés. The duties of the general superintendent, as defined by the original by-laws, had been—

"To take charge of all the property belonging to the company, to control and direct all labor and interests pertaining to the operation of the company, and, subject to the orders of the board of directors, to make monthly returns to the board of directors of all persons hired or employed at the mine, and of their wages, and a statement of all expenditures accompanying the same, with the necessary vouchers, duplicates of which he shall keep, and to report the general condition of business in his charge."

The duties of the president, as prescribed by the new by-laws, were as follows:

"The president shall preside at meetings of the directors and stockholders. He shall act as inspector of all elections of directors, and certify who are elected directors. He shall sign all deeds and contracts on behalf of the company, and all certificates of stock of the company. He shall have general charge and supervision over all the business of the company."

According to his own testimony, it does not appear that from and after the time of the adoption of the new by-laws the president performed the duties which had before been imposed upon the general superintendent, or that he rendered services to the corporation materially different from those which he had rendered before. He was at no time a superintendent of the active operations at the mine. The charge of the mine was intrusted to a local superintendent.

The company had an agent at San Francisco for the purpose of handling such of the product of the mine as should be shipped there. It also had a bookkeeper at Portland, who looked after the accounts, and made collections. The president exercised no supervision of the accounts of the corporation. He testified to his ignorance of the affairs of the company and of its books. He denied that he had received reports from the mine, or that he had made any reports of the condition of the business of the company, either to its stockholders or to its directors; and he testified that he had never examined the books of the corporation, and that he did not know what they contained, and did not know what the company's liability was to the complainant. He was unable to give any satisfactory account of the consideration of the notes which he received from the company. There are many things indicative of his want of good faith in protecting the interests of the company as its president. The special master has found that there was an agreement between him and the complainant's testator to the effect that the former should have a salary of $150 a month, beginning with the year 1889. This finding is, in my judgment, against the weight of the evidence. It is supported solely upon the bare statement of the defendant Coulter that in the year 1889 he had such an understanding by parol with John S. Doe. Coulter's testimony in other matters in this case is so contradictory, evasive, and untrustworthy as to be of little value upon any subject. His evidence in this matter, moreover, is given after the death of the other party to the alleged agreement. It is rebutted by the circumstances of the case. During the whole period from December, 1887, to January, 1893, Coulter acted as president of the corporation, without making a demand for compensation, or so much as referring to the subject of salary. The books of the company during that period likewise contain no mention of the subject. It is rebutted also by Coulter's own admission. His letter to John S. Doe, of date October 22, 1889, contains these words: "I will say, in regard to the management up here, that I have lost lots of time, but never charged a cent for my time." The resolutions allowing the president's salary were adopted, not upon the ground that there had been an agreement of the two owners of the company's stock to that effect, but upon the ground that the company had received services which ought to be paid for. They were adopted at a meeting of directors consisting of Samuel Coulter, A. S. Coulter, his son, and W. T. Hume. Mr. Hume testifies that he was "more of a clerk for Mr. Coulter, as secretary of this company, than anything else"; that he knew nothing about the particulars of the business, and was simply a figurehead, and that Coulter's word to him was law. There is no evidence that John S. Doe ever knew anything about these resolutions, or the notes that were subsequently executed in pursuance thereof. Under these circumstances, the resolution authorizing the corporation to pay a salary to the president for past services was void. The directors of a corporation have not the power to fix their own salaries, nor to bind the corporation by a resolution to pay for services which have been rendered in their official capacity under by-laws which contain no express provision for such compensation. In Association v. Stonemetz,

29 Pa. St. 534, in a case where there was no express regulation or contract that the director was to serve without pay, but the by-laws were silent upon that subject, the court said:

"A resolution, passed by the corporation after the services were rendered, that such director be paid a certain sum for services rendered as chairman of a committee, was without consideration, and imposed no obligation on the corporation that could be enforced by action."

Of similar import is Kilpatrick v. Bridge Co., 49 Pa. St. 118. In Railroad Co. v. Ketchum, 27 Conn. 170, it was held that a director of a corporation is not entitled to compensation for services rendered to the corporation, unless the services were most unquestionably beyond the range of his official duties. In Mather v. Mower Co., 118 N. Y. 629, 23 N. E. 993, it was held that, where a stockholder of a corporation becomes an officer thereof, and assumes the duties of the office, and performs them without any agreement or provision for compensation, the presumption, in view of his relation and interest, may properly arise that he intends to perform the services gratuitously. The court said:

"It is well settled that a director of a corporation is not entitled to compensation for services performed by him, as such, without the aid of a pre-existing provision expressly giving the right to it. They are the trustees for the stockholders, and as such have the management of the corporate affairs. And to permit them to assert claims for services performed, and then support them by resolution, would enable the directors to unduly appropriate the fruits of corporate enterprise. It would clearly be contrary to sound policy."

To the same effect is the case of Road Co. v. Branegan, 40 Ind. 361. In Wilbur v. Lynde, 49 Cal. 290, it was held that a promissory note made by a corporation, payable to its acting trustees, is void. In Smith v. Association, 78 Cal. 289, 20 Pac. 677, it was held that a note made by a corporation to its president is invalid unless authorized or ratified by the board of directors, and that the payee of such a note was disqualified to vote upon such a resolution. The same doctrine is held in Jones v. Morrison, 31 Minn. 140, 16 N. W. 854; Railway Co. v. Teters, 68 Ill. 144; Wood v. Manufacturing Co., 23 Or. 20, 23 Pac. 848; and in numerous other cases which might be cited.

So far, therefore, as the notes which were made to Coulter on October 7, 1893, represented a payment to him of salary for services rendered during the years 1889, 1890, 1891, and 1892, they were without consideration, and could not have been enforced in the hands of Coulter against the company. The question, then, arises, in what attitude do the present holders of the notes stand? It being shown that the notes had their inception in fraud, so far as the back salary was concerned, the presumption arising from the possession of the notes in the hands of the indorsees that the holders did in good faith pay value therefor is overcome, unless it appear affirmatively from all the evidence, whether produced upon the one side or the other, that they are in fact innocent purchasers for value. King v. Doane, 139 U. S. 166, 11 Sup. Ct. 465. The special master has found, and his findings in this respect will be confirmed by the court, that the defendants Farrell, Whalley, and Knott took their respective notes before the same were due. The notes so indorsed to Farrell stand upon

a different footing, however, from the others. They were taken .by him as collateral security for an existing indebtedness, and to secure him against liability upon unpaid promissory notes which he had signed as surety for Coulter. While in many of the states, and perhaps in a majority of them, it is held that the indorsee of a promissory note, transferred before its maturity, merely as collateral security for a pre-existing debt, is not a purchaser for value, but holds the note subject to any defense of fraud that might have been made by the maker against the payee, the rule in the federal court is to the contrary. In Railroad Co. v. National Bank, 102 U. S. 28, the court said:

"Our conclusion, therefore, is that the transfer, before maturity, of negotiable paper, as security for an antecedent debt merely, without other circumstances, if the paper be so indorsed that the holder becomes a party to the instrument, although the transfer is without express agreement by the creditor for indulgence, is not an improper use of such paper, and is as much in the usual course of commercial business as its transfer in payment of such debt. In either case, the bona fide holder is unaffected by equities or defenses between prior parties, of which he had no notice."

Applying the rule to this case, it is apparent that Farrell was a purchaser of the notes for value, that he received the same in the due course of business, and that he is a bona fide holder unless he had actual or constructive notice of the defenses that the corporation might have made thereto. It is not contended that he had actual notice of any fraud or infirmity in the inception of the notes, but it is urged that the fact alone that the notes were made by a corporation, and were made payable to its president, and were used by the president in securing his individual debt, imports such notice to him of the circumstances under which they were issued as to deprive him of the character of a bona fide purchaser. In many of the states it is held that the purchaser of a promissory note who takes the same with a knowledge of the existence of such facts as ought to have put an ordinarily prudent man upon inquiry, is chargeable with the notice of all the facts that such an inquiry would disclose. In the courts where that doctrine is applied, it is held that the fact alone that a corporation note is made payable to one of its officers, and is appropriated by him to his individual use, is sufficient to put the purchaser upon inquiry. New York Iron Mine v. First Nat. Bank of Negaunee, 39 Mich. 644; Cheever v. Railroad Co., 72 Hun, 380, 25· N. Y. Supp. 449; Bank v. Wagner (Ky.) 20 S. W. 535; Davis v. Investment Co. (Va.) 15 S. E. 547; Cattle Co. v. Foster (N. M.) 41 Pac. 522; Wilson v. Railway Co. (N. Y.) 24 N. E. 384. But in the federal courts it is the well-settled rule that the purchaser of a promissory note is not deprived of his character of purchaser in good faith by proof that he took the note with knowledge of such circumstances as ought to put an ordinarily prudent man upon inquiry to ascertain the facts. The proof must go further, and show that he had at the time of the transfer knowledge of facts that would impeach the title as between the antecedent parties to the note, or knowledge of such facts that his abstention from further inquiry will be tantamount to a willful closing .of the

eyes to the means of knowledge which he knows are available, and therefore presumptive evidence of bad faith upon his part. Goodman v. Simonds, 20 How. 343; Swift v. Smith, 102 U. S. 442; Murray v. Lardner, 2 Wall. 110; Hotchkiss v. Banks, 21 Wall. 354; Electric Co. v. Dick, 3 C. C. A. 149, 52 Fed. 379; Bank v. Holm, 19 C. C. A. 94, 71 Fed. 489. Tested by this rule, it may be said that, while the fact that the notes in this case were for large sums, and were made payable to the president of the corporation, and were used by him to secure his individual debt, would, without doubt, be sufficient to put an ordinarily prudent person upon inquiry to ascertain the antecedent facts, and the failure to make such inquiry even amounts to gross negligence, it still falls short of proving bad faith upon the part of Farrell, and is insufficient to sustain the legal presumption of his mala fides. A corporation might, in the usual course of business, become legally indebted to its president for advances or for salary, in the amount for which these notes were drawn. There is no presumption of law that such a note is invalid. The president and the secretary of a corporation are vested with implied power to execute its negotiable paper. It is clear from the evidence that Farrell accepted Coulter's statement that the corporation owed him that amount, and that he took the notes without inquiry; and it does not appear that he willfully abstained from making the inquiry from the fear that he would discover facts which might impeach their validity. It follows, also, from the foregoing considerations that the $1,000 note which went into the hands of the defendant Whalley is the binding obligation of the corporation. It was transferred to him in consideration of services to be rendered by him to Coulter, and was received in payment thereof. The $400 note to Knott was transferred to him in payment of $100 advanced at the time by him to Coulter, and to that extent he is a purchaser, and that is the extent of his interest therein. The defendant Farrell could not legally, while acting as director for the corporation, vote in favor of the execution of a mortgage to secure his own claim, but no reason is perceived why the resolution to secure the debt due defendant Whalley is not legally binding upon the corporation.

There are numerous exceptions to the statement of the account between the complainant and the defendant Coulter, as found by the special master. The special master arrived at his conclusions in the face of extraordinary difficulties, in view of the uncertainty of the testimony and the negligent manner in which the accounts of the corporation had been kept and preserved at Portland. It is impossible for the court to decide with any certainty that there were errors in the account as found by him. All the findings of fact, therefore, involved in the account will be confirmed. It appears from the books of the corporation that among its assets is a claim against the Bucoda Coal Company, a co-partnership, for $21,541.73. It was contended by the complainant that the evidence shows Samuel Coulter to have been a member of the co-partnership, and that, therefore, he is chargeable in the account with the debt which that company owes the corporation. The defendant Coulter denies that he was a member of that co-partnership, and the special master

has found that, while there is some evidence that gives color to the contention that he was such a member, it is not sufficient to warrant a finding to that effect. The Bucoda Coal Company was organized in October, 1889, and was then composed of M. M. Wright, A. F. Flegel, and Samuel Coulter. On January 14, 1891, Wright and Flegel sold out, and made a bill of sale to S. Coulter & Sons. In the negotiations leading up to the sale, C. W. Coulter, one of the sons of Samuel Coulter, acted for the purchasers. About a month prior to that time, C. W. Coulter had been made the bookkeeper of the Northwestern Coal & Transportation Company. Mr. Newby, the bookkeeper prior to that time, was discharged. On December 4th, Samuel Coulter, president of the corporation, wrote as follows:

"Mr. Doe thinks we should best economize as much as possible. Therefore you can pay off Mr. Newby, as there is but little to do until the 1st, and to keep the mine running we shall have to run as close to the wind as possible."

Accordingly Newby was dismissed on the 6th of December, and on the following day C. W. Coulter was employed in his stead. The Bucoda Coal Company had no other business than to purchase coal of the Northwestern Coal & Transportation Company, and to retail it at Portland. At the time it sold out to S. Coulter & Sons, it had done but little business. Samuel Coulter was at that time in the complete control of the Northwestern Coal & Transportation Company. He and his son A. S. Coulter were the directors of that company, and the other director, Mr. Hume, confesses that he was but a figurehead. C. W. Coulter, the other son, was the bookkeeper. It appears also that from the time of the transfer of the business to S. Coulter & Sons on January 14, 1890, and up to April, 1891, C. W. Coulter was the active manager of the Bucoda Coal Company. Samuel Coulter and C. W. Coulter both testify that the real purchaser and owner of the business of the Bucoda Coal Company from and after January 14, 1890, was A. S. Coulter, and that he was the company. The price of the coal sold to the Bucoda Coal Company prior to January 14, 1890, was $2 per ton. Shortly after that date it was reduced to $1.75 per ton. That company retailed it at Portland at an average of $4 per ton. It clearly appears that it could have paid the corporation the whole of the purchase money for the coal, but refused to do so, and was not compelled to do so by Samuel Coulter. The company is now hopelessly insolvent. It makes little difference, so far as the rights of the parties to this suit are concerned, whether or not Samuel Coulter was a co-partner in the Bucoda Coal Company. He sustained such relation to that company that his conduct in permitting its debt to his corporation to increase as it did, and in continuing to sell the output of the mine to that company in the face of the fact that it was not paying for the same, but was running up a rapidly increasing debt therefor, amounts to the grossest negligence, and is sufficient in law to charge him with the whole amount which the corporation has thereby lost. In the account between the complainant and the defendant Samuel Coulter, the latter will be charged with the amount of all the said sums so decreed to be paid to the defendants Whalley, Knott, and

Farrell; also with the amount so due from the Bucoda Coal Company to the said corporation.

It appears that at a meeting of the directors held on June 13, 1894, the attorney of the complainant in this case was authorized to ascertain the amount of a certain note of the corporation in favor of Thomas Ismay for $3,608.80, which had been executed on the 29th day of October, 1892, and was secured by a mortgage on certain property of the corporation, and to purchase and take an assignment of said note and mortgage, and to hold therefor a claim against the corporation, as if the money had been originally advanced by the complainant in the place of said Ismay. The note and mortgage were so purchased in pursuance of said resolution, and it is found by the special master that there is due and owing to the complainant thereon the sum of $————. It is contended on behalf of the defendants that this transaction was only a loan of funds from the complainant to the corporation, and that the complainant is an unsecured creditor to that amount. I do not so find the equities. It was plainly the intention of the resolution to substitute the complainant for Ismay as a lienholder against the corporation. And, if there had been no such resolution, the complainant would nevertheless be entitled to enforce the lien against the corporation, from the fact that he is the assignee thereof. This lien is the first in order of priority of the liens created by the corporation.

It is contended that the mortgage of the defendant J. W. Whalley is invalid, for the reason that at the time when it was executed the corporation was insolvent, to his knowledge, and that to permit it under those circumstances to prefer one creditor to others would be to disregard the well-established rule of equity that the property of an insolvent corporation is a trust fund to be held for the equal benefit of all its creditors. There are decisions that uphold this view of the rule, but it is not so held in the federal courts. In Fogg v. Blair, 133 U. S. 534, 10 Sup. Ct. 338, Mr. Justice Field, in referring to the general doctrine that the property of a corporation is a trust fund for the payment of its debts, said:

"That doctrine only means that the property must first be appropriated to the payment of the debts of the company before any portion of it can be distributed to the stockholders. It does not mean that the property is so affected by the indebtedness of the company that it cannot be sold, transferred, or mortgaged to bona fide purchasers for a valuable consideration, except subject to the liability of being appropriated to pay that indebtedness. Such a doctrine has no existence."

In Adams v. Milling Co., 35 Fed. 433, it was said:

"It may be conceded that a corporation, though insolvent, has the power to prefer creditors."

The same was held in Lippincott v. Carriage Co., 25 Fed. 586. In Hollins v. Iron Co., 150 U. S. 371, 14 Sup. Ct. 127, the court said:

"A party may deal with a corporation in respect to its property in the same manner as with an individual owner, and with no greater danger of being held to have received into his possession property burdened with a trust or lien. The officers of a corporation act in a fiduciary capacity in respect to its property in their hands, and may be called to an account for fraud, or sometimes even mere mismanagement in respect thereto; but, as between itself and its creditors, the corporation is simply a debtor, and does not hold its property in trust, or subject to a lien in their favor, in any other sense than does an individual debtor."

But it is not shown with any certainty that the corporation was insolvent at the date of the mortgage to the defendant Whalley, nor that its property was not adequate to meet all its liabilities. Various estimates were placed upon the value of its assets at that date. All that can be said to be definitely shown by the proof is that the business of coal mining as conducted by the corporation was unsuccessful, and the proceeds thereof insufficient to pay current expenses. It does not appear that the directors of the corporation at the time of executing the mortgage understood the corporation to be insolvent. The complainant's interests were at that time represented in the board of directors. Objection was made to the execution of the mortgage, not on the ground that the corporation was insolvent, or that the mortgage would operate to prefer the secured creditor, but on the ground that the note so sought to be secured was not the valid and binding obligation of the corporation. Nor is it proven that the mortgagee Whalley was aware of the insolvency of the corporation, if such insolvency then existed.

It appears from the evidence that the defendant Farrell has received from the corporation other security for his debt, and it is contended that he must first exhaust that security before receiving payment of his claim out of the general assets of the corporation. It has been held by some courts that a creditor having a lien or collateral security cannot participate in the general assets of the corporation until he has first exhausted such security, but the decided weight of authority is against the proposition. In Lewis v. U. S., 92 U. S. 618, it was said:

"It is a settled principle of equity that a creditor holding collaterals is not bound to apply them before enforcing his direct remedies against the debtor."

The same was held in Bank v. Armstrong, 8 C. C. A. 155, 59 Fed. 372; Tod v. Land Co., 57 Fed. 47; New York Security & Trust Co. v. Lombard Inv. Co., 73 Fed. 537; Kellogg v. Miller, 22 Or. 406, 30 Pac. 229. The defendant Farrell, therefore, is not compelled to first exhaust his security, and thereafter present to this court his claim for a balance payable out of the proceeds of the company's property. But if it should appear that, after the payment to him of such amount or dividend as he may receive out of the assets which shall be finally distributed under the decree in this cause, the value of the security which he holds is then more than sufficient to pay the balance due him, the corporation will undoubtedly have the right to redeem said property from the lien, and the unpaid creditors herein can avail themselves of the fund thereby realized.

It is contended that neither the amount due the estate of John S. Doe, deceased, nor the amount due the complainant herein, is entitled to rank with the claim of the defendant Farrell, for the reason that it does not appear affirmatively that the liability of John S. Doe for the par value of his stock in the corporation has ever been paid. No evidence was offered directly upon this question, but it appears from the corporation records that the mining property of the corporation was taken by it in payment of 50 per centum of the liability of stockholders upon the subscribed stock, and that there

after 11 assessments of 5 per centum each were levied upon the stock at intervals from December 8, 1885, to November 5, 1887, and that thereby the full amount of the par value of the stock was assessed. These assessments were each made payable 30 days from date. There is nothing in the records of the corporation to indicate that they were not duly paid as assessed. In the absence of a showing to the contrary, it will be presumed that they were so paid, and that thereby the full amount of the par value of the subscribed stock has been received by the corporation.

The complainant's counsel asks for an allowance of attorney's fees for conducting this suit on behalf of creditors, invoking the rule that where, by the diligence of one creditor, a fund has been discovered of which other creditors, without expense to themselves, reap the benefit, equity will impose upon the latter the burden of paying costs before they shall be entitled to share the fund. This, however, is not a case in which the rule is applicable. The complainant and his testator's estate have by far the largest claims against the corporation, and, instead of uncovering a fund, and making it available for the payment of the debts of other creditors, they have brought this suit against the other creditors, denying their right, and have compelled them to defend the same.

The attention of the court is directed to certain receiver's certificates which have been issued by the receiver appointed in this case under the authority of an order of the circuit court of the United States for the District of Washington, in a suit ancillary to this, which was instituted in that jurisdiction. Since those certificates have been issued under the authority of that court, the matter of ordering their final payment and of determining what sums are due thereon, together with the compensation of the receiver, will be relegated to that court. The question has arisen whether such receiver's certificates are entitled to payment out of the assets of the corporation in preference to the mortgage liens. The corporation in this case is a private corporation, and the reasons which have led the courts to hold that in the operation of a railroad company in the hands of a receiver the expenses of maintaining the property and preserving it pending the suit shall be a charge, not only upon the earnings, but upon the corpus, in preference to existing liens, do not apply. The defendants Whalley and Knott have not consented to the issuance of the receiver's certificates. In the absence of such consent, the liens of those defendants will not be postponed to the liens created by the receiver's certificates, or by the receivership. Farmers' Loan & Trust Co. v. Grape Creek Coal Co., 50 Fed. 481; Hanna v. Trust Co., 16 C. C. A. 586, 70 Fed. 2; Fidelity Insurance, Trust & Safe-Deposit Co. v. Roanoke Iron Co., 68 Fed. 623. But the complainant has consented to the issuance of the receiver's certificates, and has thereby postponed his lien to the indebtedness so created. The decree of distribution of the property will therefore be as follows:

Out of the proceeds of the sale of the property will first be paid the costs of sale and the costs of this suit. Second, there will be paid, on account of receiver's certificates, a sum not to exceed the amount due upon the Ismay note and mortgage, now held by the complainant.

There will be paid, third, the mortgage debt due the defendant J. W. Whalley; fourth, the amount due the defendant A. J. Knott, with his costs and attorney's fees as herein allowed; fifth, the remainder of the indebtedness incurred by the receivership; sixth, the amount due the complainant on the Ismay mortgage. Out of the surplus then remaining, if any there be, there will be paid the complainant's unsecured claim as allowed herein, the interveners' claim, and the claim of the defendant Farrell, and such other unsecured creditors, if any there be, as shall, on or before the date of final distribution, have established in this court and cause their claims against said corporation. And in case the proceeds of such sale and the total assets of said corporation are insufficient to pay all of said claims in full, then that said unsecured claims be paid pro rata.