**In re PRIMA CO.**

**FIRST NAT. BANK OF CHICAGO v. PRIMA CO. et al.**

Nos. 6141, 6142.

Circuit Court of Appeals, Seventh Circuit.

March 3, 1937.

SPARKS, Circuit Judge, dissenting.

Henry S. Blum, of Chicago, Ill., for appellant.

Paul F. Koenig and P. A. Rattray, both of Chicago, Ill. (Edmund D. Adcock, of Chicago, Ill., of counsel), for appellee Marshall Keig.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

The narrow question presented for our determination concerns the power of the District Court sitting as a court of bankruptcy to authorize, in a pending proceeding brought under section 77B of the Bankruptcy Act, as amended 11 U.S.C.A. § 207, the issuance of trustee's certificates which are to have a lien[1] prior to an existing mortgage trust deed on debtor's property, where the trust deed expressly provided that no lien prior to the trust deed's lien should be created, secured by the said property.

The debtor, a large manufacturer and distributor of beer, with its place of business in Chicago, filed a voluntary petition under section 77B. Its "going value" and other assets are asserted to be worth $3,043,228.35. Its liabilities were $1,070,-797.89. The statement of asset value is an estimate, or opinion. The total liabilities are a reality. The debts include $761,400 of five per cent. notes secured by the trust deed dated September 1, 1935, maturing serially September 1, 1936, 1937, and 1938. The First National Bank of Chicago, trustee named in the trust deed, intervened in the proceedings in the District Court and objected when the trustee petitioned the court for an order authorizing the issuance and sale of $20,000 of trustee's certificates, which were to be payable in six months. Over said trustee's objection, the court directed the issuance of these trust certificates, and directed that they be a first lien (ahead of the lien of the mortgage) on all of the debtor's property.

The petition for leave to issue these certificates set forth the necessity of securing funds with which to purchase licenses, stamps, malt and other beer ingredients, to pay labor, and material bills, etc. The petition for adjudication was filed August 14, 1936, and it appears that the winter months are not the most profitable months for the manufacture and

---

[1] "That all of such certificates, when issued and sold, shall be and constitute a lien and charge upon all the property, real, personal and mixed, of whatsoever nature or character of the Prima Company, a corporation, then in the hands of Marshall Keig, as trustee aforesaid, and which might thereafter come into the hands of said trustee, and upon all earnings and income thereof, which was then or might thereafter come into the hands of said trustee, subject to payment of costs of administration, wages, materials and other current operating expenses, which lien shall be prior and superior to rights and interests of all parties to this suit and prior to any mortgage and bonds issued thereunder and secured thereby and prior to the claims of all stockholders and creditors of the said Debtor, Prima Company, a corporation, or any one claiming under them or it."

sale of beer. It also appeared that large amounts of perishable products, valued at $60,000, would be destroyed if the business were closed. Without reciting all the facts, it is a fair statement of the District Court's conclusion to say that a closing and liquidation of the debtor's business would result in large losses; that the continuance of the business is necessary to a realization of a fair value of the debtor's assets; that the security of the lien of the first mortgage would not be, in fact, impaired by the issuance of the $20,000 of trustee's certificates.

The action of the court in ordering the issuance of the certificates is supported generally by the unsecured creditors and the stockholders, as well as by some of the mortgage bondholders. Appellant is the trustee named in the trust deed. It is also the holder of a substantial number of the bonds. Another bank is also the holder of a considerable number of bonds. There are other bondholders who are desirous of continuing the brewery and attempting a reorganization under section 77B, as amended 11 U.S.C.A. § 207. They are, generally speaking, individual bondholders. It is as trustee named in the trust deed that the First National Bank objected and now appeals.

In determining this question of the court's power to issue first lien certificates, we must assume that in view of the court's action it would be highly advantageous to the debtor to issue the trustee's certificates in question and that the termination of the debtor's business and the liquidation of its assets would be prejudicial to the interest of all, save first mortgage bondholders; that the first mortgage bondholders would not, in fact, be prejudiced in any way by the issuance of the trustee's certificates, because the security of the mortgage bondholders is ample whether the property be liquidated or whether the business be continued. At least this is the conclusion which appellee asserts and is inferentially supported by the court's order.

If we accept, as we do, the fact statement of the preceding paragraph, appellant's rights are naked legal rights devoid of equity and are based upon a legal proposition which denies to a court of bankruptcy power to direct the issuance of first lien trust certificates against the objection of the first mortgage bondholders, regardless of the strong showing of necessity and advisability.

It is counsel's contention that neither a trustee appointed in a proper 77B proceedings nor an equity receiver (excepting in utility receiverships) may issue certificates, even though authorized so to do by order of the court, which will be ahead of the lien of an existing mortgage, over the objection of the mortgagee.

The appellee on the other hand finds his support for the action of the court in subsection (c) (3) of section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207 (c) (3). He stresses the difference between the phraseology in respect to the court's authority to issue trustee's certificates, appearing in section 77 (c) (3), 11 U.S.C.A. § 205 (c) (3), which provides "as might in an equity receivership be lawful," and that appearing in section 77B (c) (3), which provides "as may be lawful in the particular case," as indicative of Congressional intention to provide different limitations on the court's powers in the two situations.

Section 77B (c) (3) provides:

" * * * The judge * * * (3) may, for cause shown, authorize the debtor or the trustee or trustees, if appointed, to issue certificates for cash, property, or other consideration approved by the judge for such lawful purposes, *and upon such terms and conditions and with such security and such priority in payments over existing obligations, secured or unsecured, as may be lawful in the particular case.*"

With the fact issue thus eliminated there remain two questions, both legal. (a) Did Congress, through section 77B (c) (3), confer upon the court of bankruptcy authority to issue trustee's certificates and give them priority over existing mortgage liens? (b) If it did, was such legislation repugnant to and subject to provisions of the Federal Constitution which expressly denied power to Congress?

In considering section 77B and the authority of the court to direct the issuance of trustee's first lien certificates, we accept as well settled the following: (1) Section 77B is remedial in character and should be liberally construed to carry out its purposes.[2] (2) In the somewhat analogous field of law, in equity suits where

---

[2] In re Chicago, R. I. & P. Ry. Co. (C.C.A.) 72 F.(2d) 443.

receiver's certificates are issued, courts are, with rare exceptions, not authorized to make the certificates a lien ahead of existing mortgages.[3] The exception referred to has been almost entirely limited to railroad receiverships.[4] In railroad receiverships the courts have held that such certificates may be made a lien prior to that of the existing mortgage. The exception in favor of the first lien receivership certificates has been extended in a few cases.[5]

In analyzing and construing section 77B (c) (3), we must keep in mind that this and all other bankruptcy legislation was expressly authorized by the Federal Constitution. As we stated in the Chicago, R. I. & P. Ry. Co. Case, 72 F.(2d) 443, 452:

"Likewise, legislation which deals with the subject of bankruptcy, that is, legislation for the benefit and relief of creditors and debtors—is not subject to the same constitutional limitations as legislation which deals with other subjects and which affects contractual rights and obligations of debtors and creditors. The grant of power 'to establish * * * uniform Laws on the subject of Bankruptcies' (Const. art. 1, § 8, subd. 4) was necessarily a grant of power the exercise of which would impair the obligation of contracts."

All parties to a contract are, of necessity, aware of the existence of, and subject to, the power of Congress to legislate on the subject of bankruptcies. They were and are chargeable with knowledge that their rights and remedies, in case the debtor becomes insolvent and is adjudicated a bankrupt, are affected by existing bankruptcy laws and all future lawful bankruptcy legislation which might be enacted. The amendments to the bankruptcy laws were not therefore necessarily an unlawful impairment of the contractual rights of either party. All loans were made and all credit extended with the knowledge that the power to enact such laws existed and application of such legislation might alter the contractual rights of the creditor. To illustrate: A discharge in bankruptcy is the goal of the debtor in the ordinary bankruptcy proceedings. Yet, a discharge of debts necessarily abridges the creditor's contract and his rights thereunder. Another unavoidable conclusion is that all contracts are made with the knowledge that existing bankruptcy laws may be amended.

Modification of the bankruptcy laws, however, does not necessarily mean the impairment of existing contracts or the lessening of creditor's rights and remedies. The amendments may be promotive of such remedies. In fact, the entire bankruptcy act might be repealed and no vested right invaded.

The significant fact which this discussion is aimed to establish is that the Constitutional provision authorizing bankruptcy legislation existed when the contracts were made, and therefore all contracts were, and are, subject to all valid legislation which Congress may enact pursuant to the grant of power appearing in article 1, section 8.

As illustrative of the power of Congress to act as well as of its enactment, reference is made to that section (77B (e) (1), amended by Act Aug. 29, 1935, 11 U.S.C.A. § 207 (e) (1), which permits of a modification of the terms of the contract either as to extension of time, rate of interest, or substitution of other securities where more than two-thirds of the

[3] 23 Ruling Case Law, "Receivers," § 96; Hanna v. State Trust Co. (C.C.A.) 70 F. 2, 30 L.R.A. 201; Fidelity Ins., Trust, etc., v. Roanoke Iron Co. (C.C.) 68 F. 623; Doe v. Northwestern Coal & Transp. Co. (C.C.) 78 F. 62; Kneeland v. Amer. Loan & T. Co., 136 U.S. 89, 10 S.Ct. 950, 34 L.Ed. 379; Lockport Felt Co. v. United Box Board, etc., Co., 74 N.J.Eq. 686, 70 A. 980; Int. Trust Co. v. Decker Bros. (C.C.A.) 152 F. 78, 11 L.R.A.(N.S.) 152; Balt. Bldg. & L. Ass'n v. Alderson (C.C. A.) 90 F. 142; Int. Trust Co. v. United Coal Co., 27 Colo. 246, 60 P. 621, 83 Am. St.Rep. 59; Farmers' Loan & Trust Co. v. Grape Creek Coal Co. (C.C.) 50 F. 481, 16 L.R.A. 603.

[4] 23 Ruling Case Law, "Receivers," § 95; Clark on Receivers, p. 623; Wood v. Guarantee Trust & S.-D. Co., 128 U.S. 416, 9 S.Ct. 131, 42 L.Ed. 472; Farmers' Loan & T. Co. v. Grape Creek Coal Co. (C.C.) 50 F. 481, 16 L.R.A. 603; Merriam v. Victory Placer Min. Co., 37 Or. 321, 60 P. 997; Int. Trust Co. v. Decker Bros. (C. C.A.) 152 F. 78, 11 L.R.A.(N.S.) 152; Cowden v Wild Goose M. & T. Co. (C.C. A.) 199 F. 561.

[5] Hanna v. State Trust Co. (C.C.A.) 70 F. 2, 30 L.R.A. 201; McDermott v. Pentress Gas. Co., 82 W.Va. 230, 95 S.E. 841; Central Trust & Savings Co. v. Chester County Electric Co., 9 Del.Ch. 247, 80 A. 801.

bondholders consent. This right of two-thirds to bind the one-third is, of course, a clear modification of the existing contracts and of the contractual rights and remedies of minority bondholders who object to the plan of reorganization of the debtor under section 77B. Nevertheless, such legislation is not assailable as an unauthorized act of Congress. On the subject of bankruptcies, the power of Congress is as clear as are other constitutional provisions which deny to Congress power to legislate in certain fields.

Section 77B contemplated the reorganization of debtor corporations other than railroads. Viewed practically, it was legislation for the purpose of promoting the creditors' prospects of full, or a better, realization of their claims than would occur through immediate liquidation. Likewise, it contemplated an extension of opportunity to the debtor to realize on its assets something more than what was obtainable in the deep depression years which still existed at the date of the enactment of section 77B. Such being the purpose and object of the legislation, and its scope being broad and inclusive and covering the compulsory acceptance of plans where requisite creditor support appeared, against minority bondholders' objection, it seems quite impossible for us to reach a conclusion which denies to Congress the power to enact legislation which authorized courts of bankruptcy to issue trustee's certificates and to make them prior to outstanding mortgages.

It would seem that the court's right to order the issuance of such certificates under express grant of authority by Congress is much more certain than was the power of a court of equity to authorize such first lien certificates in railroad receivership suits. There, the source of power was implied—necessary to the full exercise of recognized powers over corporations whose activities were so intimately connected with the public welfare that the existence of the power was implied. In the bankruptcy statute, the authority is not implied. It is expressly given to the courts.

We may well doubt the wisdom of arbitrarily drawing the line even in equity receiverships between railroad and other corporation receiverships. Where the difference which supports affirmative relief in one and denies it in another is merely a matter of degree, we may well doubt the wisdom of arbitrary classification, or any other basis which can be recognized only in terms of relativity. We are here, however, dealing with bankruptcy legislation, not with the power of courts of equity generally, to issue first lien trustee's certificates. Reference to action of courts of equity has been for no other purpose than to secure light in a somewhat analogous field and to ascertain, if possible, the differences in the two fields of jurisdiction.

Having concluded that Congress possesses the express power to authorize a court of bankruptcy to issue first lien certificates, we are confronted by the second question, Did Congress empower the court to authorize the issuance of such certificates in cases like the one before us?

Section 77B (c) (3), 11 U.S.C.A. § 207 (c) (3) undoubtedly empowered courts of bankruptcy to authorize the issuance of trustee or debtor certificates. The authority conveyed is broad. The grounds are "for cause shown." Likewise, the terms and conditions—"and with such security *and such priority in payments over existing obligations, secured or unsecured*" are so clearly and specifically expressed as to eliminate all doubt and avoid all debate. The last clause of section 77B (c) (3) is what creates the confusion and affords the basis for differences of opinion. Neither counsel may justly be accused of being a mere logomachist, delighting in the search and production of definitions, when arguing over the correct meaning of the word "lawful" as it is used in this last clause of this section. The language at best is unfortunate and becomes doubtful because, as we have pointed out, in a court of equity, receivership first lien certificate provisions are generally unauthorized.

What does the phrase "as may be lawful in the particular case" mean? Construing "lawful in the particular case" we must not overlook the fact that another section deals separately and particularly with railroad reorganizations. Section 77B (c) (3) therefore could hardly be intended to apply exclusively to cases involving railroads. Section 77B, we think, dealt with and was intended to deal with all the ordinary commercial corporations that are or were in financial trouble when 77B was enacted. It was with their reorganization in bankruptcy that Congress

was dealing when it enacted section 77B (c) (3).

We feel therefore that we must reject the view that the last clause was intended to limit the authorization of first lien certificates to cases of railroads which were the only equity receiverships where such first lien certificates might be lawfully issued. "Lawful" must have a meaning somewhat different from "legal," and the conclusion we adopt is that the certificates may be issued and made a first lien if the facts in the instant case make their issuance valid. The facts in each case must determine their validity. If valid, they are *"lawful* in the particular case." If there were an unwise exercise of the court's discretion—if there were an insufficient fact showing, they might be declared invalid upon appeal. In other words, their issuance would not be lawful.

The facts in the present case heretofore cited may be used to illustrate our point. The order authorized the issuance of $20,000 of certificates. This is about three-fourths of one per cent. of the value of the debtor's property. Perishable personal property, which would be entirely lost if liquidation occurred, exceeded by three times the amount of the certificates. The winter season is unfavorable for the beer business. The bankruptcy proceedings were instituted as the profitable part of the 1936 season drew to an end. The certificates will be due in six months. The court will be better informed and therefore in a better position to help the debtor and creditors out of their difficulties at that time. In other words, the facts strongly support the exercise of the judicial discretion which the statute vested in the District Court. To apply the phrase in question we may say that the facts in the particular case showed the issuance of the warrants to be "lawful."

Before finally disposing of this question, we feel warranted in sounding a note of warning. The exercise of the power to authorize the issuance of trustee's certificates and to supplant the existing first mortgage calls for careful, cautious, and considerate action by the court. Such power should not be abused by an unwise exercise of discretion. Petitioner's case must be a strong one, unless the bondholders consent. Generally speaking, the creditors should be denied the relief if the certificates are saleable without being made a first lien. Creditors, who are desirous of continuing the operation of the business, may well be asked to advance the money and purchase such certificates. Moreover, these certificates may be made a first lien on assets not covered by the mortgage. In brief, it must be apparent that where a debtor in financial straits, hard pressed to keep its head above water, goes into a court of bankruptcy to reorganize, it is natural and quite likely that the creditors will be aligned into two sharply divided camps. One group represents the unsecured creditors and the stockholders. They have nothing to lose by a continuation of the business. Opposed to this group is a second, composed of the secured creditors who insist upon the immediate realization of their claims. The first class visions nothing but a rosy future with all debts ultimately paid and the stockholders in full possession of their property, with management unvexed by creditors' supervision and unembarrassed by unsolicited creditor advice, enjoying substantial dividends which are the just reward of keen foresight and great courage. The secured creditor, on the other hand, is apt to fear much and to have gloomy forebodings of a dismal future, darkened by shadows of the unforeseen. The plan this group advocates may be and often is selfish, but the secured creditor can consistently and stoutly assert that he did not invest his money as a speculation, as did the stockholders and some of the unsecured creditors. If he overstresses his rights, belittles the existence and value of the equities, and if his position seems somewhat unfair, as well as unsympathetic, in view of the total assets compared to the small amount of mortgage indebtedness, the court should nevertheless never take any serious chance of impairing his security to merely postpone the evil day to unsecured creditors and stockholders. If the court does not so approach the question, but acts merely on hopes unsupported by facts, its order "in the particular case" will not be "lawful." On appeal, it will be reversed. This is what we think the last clause of section 77B (c) (3) means.

So construing the statute and applying it to the facts in the instant case, the orders appealed from must be and are affirmed.

SPARKS, Circuit Judge, dissents.