688 F.2d 447
 6 Collier Bankr.Cas.2d 1441, 9 Bankr.Ct.Dec. 730
 In the Matter of Willis R. GIFFORD and Jacqueline M.
Gifford, Bankrupts-Appellees,
Appeal of THORP FINANCE CORPORATION, Creditor-Appellant.
United States of America, Intervenor-Appellee.
 No. 81-1174.
 United States Court of Appeals, Seventh Circuit.
 Reargued May 26, 1982.
Decided Aug. 18, 1982.
 
 Henry F. Field, Friedman & Koven, Chicago, Ill., for creditor-appellant.
 Michael J. Lund, Frisch, Dudek & Slattery, Ltd., Milwaukee, Wis., for bankrupts-appellees.
 John Morland, Washington, D. C., for intervenor-appellee.
 Before CUMMINGS, Chief Judge, and PELL, BAUER, WOOD, CUDAHY, ESCHBACH, POSNER and COFFEY, Circuit Judges.
 CUMMINGS, Chief Judge.
 
 
 1
 This is an appeal from an order of a three-judge bankruptcy court that relied on 11 U.S.C. § 522(f)(2)(A) to discharge Thorp Finance Corporation's nonpossessory, nonpurchase-money security interest in various household goods owned by Mr. and Mrs. Gifford. Thorp's security interest attached to the household goods one month before Section 522(f) of the Bankruptcy Reform Act of 1978 was enacted, raising the issues of whether Section 522(f) applies to Thorp's security interest and if so whether that application is constitutional.
 
 
 2
 We first heard arguments on September 21, 1981, and on January 21, 1982, a majority of the hearing panel decided that Section 522(f) did not apply to Thorp's pre-enactment security interest because such application "would give rise to * * * serious constitutional questions under the Fifth Amendment." 669 F.2d 468, 470 (7th Cir.). Following a rehearing of the appeal en banc, we now hold that Section 522(f) applies to Thorp's security interest and that it is not unconstitutional under the Fifth Amendment.
 
 
 3
 * On October 4, 1978, Thorp lent the Giffords approximately $3,000 and in return took a security interest in two television sets, a rug, a tape recorder, a washer and dryer, and several pieces of their furniture. The loan was not used to purchase any of the items of collateral, and Thorp did not take possession of the collateral. On June 9, 1980, the Giffords filed a petition in bankruptcy and then sought to avoid the security interest in their household goods and furniture under 11 U.S.C. § 522(f)(2)(A). Section 522(f) provides:
 
 
 4
 Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under (11 U.S.C. § 522(b) ), if such lien is-
 
 
 5
 (1) a judicial lien; or
 
 
 6
 (2) a nonpossessory, nonpurchase-money security interest in any-
 
 
 7
 (A) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor;
 
 
 8
 (B) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; or(C) professionally prescribed health aids for the debtor or a dependent of the debtor.
 
 
 9
 Sections 522(b) and 522(d)(3) allow the Giffords exemptions for the collateral that is subject to Thorp's security interest, not to exceed $200 for any particular item. Thus Thorp's lien "impairs an exemption to which the debtor(s) would have been entitled under (Section 522(b) )." Because each item of collateral qualifies as a household furnishing, household good, or appliance,[1] all the requirements for application of Section 522(f)(2)(A) are satisfied. Since no item of collateral is worth more than $200, if Section 522(f) is held to apply to Thorp's pre-enactment security interest, the Giffords may avoid the security interest in its entirety.
 
 
 10
 Thorp contested avoidance of its lien before the bankruptcy court on the ground that application of Section 522(f) to pre-enactment liens would be unconstitutional. The bankruptcy court disagreed and held that Congress intended Section 522(f) to apply to pre-enactment liens and that there is no constitutional problem in doing so. 7 B.R. 814, 817-819 (Bkrtcy.). Thorp has appealed from that decision and we allowed the United States to intervene in the appeal as a respondent.
 
 II
 
 11
 The first question is whether Section 522(f) was meant to apply to security interests that attached prior to its enactment. Section 522(f) was enacted as part of the Bankruptcy Reform Act of 1978 on November 6, 1978. Pub.L.No. 95-598, 92 Stat. 2578 (codified at 11 U.S.C. §§ 101 et seq.). Like the other substantive provisions of the 1978 Bankruptcy Act, however, Section 522(f) does not state when it-as opposed to the rest of the 1978 Act-is to apply. Rather, Congress placed all of its directions for the transition between the old and new bankruptcy laws in Title IV of the 1978 Act. Section 401 of Title IV provides that all former laws relating to bankruptcy are repealed. Section 402(a) states that "(e)xcept as otherwise provided in (Title IV), this Act shall take effect on October 1, 1979." The combined effect of Sections 401 and 402(a) is to provide as substantive law only the 1978 Act for cases commenced on or after October 1, 1979. See generally 1 Collier on Bankruptcy PP 7.01, 7.02 (15th ed. 1982). Because Title IV provides no exceptions for Section 522(f), that Section must apply to cases filed on or after the effective date of October 1, 1979. Since the Giffords filed for bankruptcy on June 9, 1980, Section 522(f) is applicable to the security interest in their case.[2]
 
 
 12
 The other Courts of Appeals that have considered whether Section 522(f) applies to pre-enactment security interests agree that it does. Rodrock v. Security Industrial Bank, 642 F.2d 1193, 1196-1197 (10th Cir. 1981) (Section 522(f)(2) applies to pre-enactment security interests), probable jurisdiction noted sub nom. United States v. Security Industrial Bank, --- U.S. ----, 102 S.Ct. 969, 71 L.Ed.2d 108, In re Ashe, 669 F.2d 105 (3d Cir. 1982) (applying Section 522(f)(1), which permits avoidance of certain judicial liens, to pre-enactment cognovit note); see also In re Webber, 674 F.2d 796, 801-802 (9th Cir. 1982) (Section 522(f)(2) applies to pre-effective date liens). At oral argument, counsel for the United States told us without contradiction that some sixty-five bankruptcy court opinions have also interpreted Section 522(f) to apply to pre-enactment liens. See, e.g., In re Morris, 12 B.R. 321 (Bkrtcy.N.D.Ill.1981); In re Giles, 9 B.R. 135 (Bkrtcy.E.D.Tenn.1981); In re Pillow, 8 B.R. 404 (Bkrtcy.D.Utah 1981). It is unnecessary to repeat here the reasoning laid out in those opinions. See also 669 F.2d at 475-478 (Cummings, C.J., dissenting). Again according to counsel, only five bankruptcy court opinions disagree.
 
 
 13
 Thorp has presented one argument that the prior cases do not address, however. A preliminary draft of the transition provisions stated that the new Bankruptcy Act "shall apply in all cases or proceedings instituted after its effective date, regardless of the date of occurrence of any of the operative facts determining legal rights, duties, or liabilities hereunder." H.R. 31 (also H.R. 32), 94th Cong., 1st Sess. § 10-103(a) (§ 11-103(a) ) (1975), reprinted in Bankruptcy Act Revision: Hearings on H.R. 31 and H.R. 32 Before the House Subcommittee on Civil and Constitutional Rights, 94th Cong., 1st Sess. App. 1 at 321 (1976). Thorp argues that because the above language was criticized by William Plumb in testimony before the House Subcommittee as an improper impairment of vested property rights and then deleted from the final version of the Act, Congress meant to preserve security interests that attached prior to enactment. See Bankruptcy Act Revision: Hearings on H.R. 31 and H.R. 32 Before the House Subcommittee on Civil and Constitutional Rights, 94th Cong., 1st Sess. 2034, 2066-2067 (1976). But Mr. Plumb was only one of many witnesses to testify before Congress and there is no indication that the language was omitted because of fear of unconstitutionality.[3] We therefore attach little weight to his concerns and construe the statute as it was finally enacted, requiring whole application of the new Act to bankruptcies filed on or after October 1, 1979, with immaterial exceptions.
 
 III
 
 14
 The question presented by this appeal, then, is whether application of Section 522(f) to avoid Thorp's pre-enactment lien in the Giffords' household goods violates the Fifth Amendment.[4] Thorp argues primarily that Section 522(f) works an uncompensated taking of its property rights in the collateral, and alternatively, that Section 522(f) is a violation of substantive due process.
 
 
 15
 The two Courts of Appeals that have considered whether avoidance of a pre-enactment lien violates the Fifth Amendment have split on the issue. In Rodrock v. Security Industrial Bank, 642 F.2d 1193 (10th Cir. 1981), probable jurisdiction noted sub nom. United States v. Security Industrial Bank, --- U.S. ----, 102 S.Ct. 969, 71 L.Ed.2d 108, the Tenth Circuit held that "Congress may not under the bankruptcy power completely take for the benefit of a debtor rights in specific property previously acquired by a creditor." 642 F.2d at 1198. The Rodrock Court did not state whether Section 522(f) effected a taking, deprived the creditor of property without due process, or was simply beyond Congress' bankruptcy powers to enact. Instead, the Court relied completely upon the Supreme Court's decision of Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, which invalidated relief provisions of the Frazier-Lemke Act of 1934.[5]
 
 
 16
 To the contrary, the Third Circuit in In re Ashe, 669 F.2d 105 (3d Cir. 1982) held that application of Section 522(f) to pre-enactment judicial liens did not violate the Fifth Amendment. The Ashe Court stated, "Only if a taking for public use is found does the just compensation standard apply. Plainly Section 522(f)(1) is an economic regulation rather than a taking for public use." 669 F.2d at 110. Since this instance of economic regulation had a rational basis, the Third Circuit held that Section 522(f) comports with the requirements of due process. Id. at 110-111.
 
 
 17
 The Ninth Circuit recently held that the Fifth Amendment did not prohibit application of Section 522(f) to security interests in household goods that attached during the eleven-month period between enactment and the effective date of the new Act. In re Webber, 674 F.2d 796 (9th Cir. 1982). Quoting a dictum in our former majority opinion, the two-judge majority noted, also in dictum, "We agree that a 'property right is of value regardless of the worth of the object in which it is held, and is protected from governmental appropriation by the taking clause of the Fifth Amendment.' " Id. at 803 n. 16 (quoting 669 F.2d at 473). But the quoted language is only a truism-all property is protected by the taking clause to the extent that it applies-and the Ninth Circuit majority did not decide the constitutional question before us. Judge Schroeder's concurrence did not reveal her views on pre-enactment liens, and she wrote separately only to state that application of Section 522(f) to post-enactment, pre-effective date liens "does not present a substantial question, much less a close one." Id. at 804.
 
 
 18
 As explained infra, we agree with the Third Circuit's opinion in In re Ashe that Section 522(f) as applied to pre-enactment security interests does not violate either the due process or taking clauses of the Fifth Amendment.
 
 IV
 
 19
 Section 522(f) quite clearly is valid under the due process clause. In the early years of this century, Congressional legislation was closely scrutinized by the courts under the rubric of "substantive due process." See, e.g., Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937. But that approach has "long since been discarded" by the courts (Ferguson v. Skrupa, 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93), and it is now well established that economic regulation will be sustained against substantive due process challenges provided the regulation has a rational basis. See, e.g., Williamson v. Lee Optical Co., 348 U.S. 483, 487-488, 75 S.Ct. 461, 464, 99 L.Ed. 563; United States v. Carolene Products Co., 304 U.S. 144, 152, 58 S.Ct. 778, 783, 82 L.Ed. 1234; In re Ashe, supra, 669 F.2d at 110. Even when a question of retroactivity is involved, "legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and * * * the burden is on the one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752; see also Brach v. Amoco Oil Co., 677 F.2d 1213 at 1224-25 (7th Cir. 1982). Indeed, under the bankruptcy clause of the Constitution,[6] "Congress may prescribe any regulations concerning discharge in bankruptcy that are not so grossly unreasonable as to be incompatible with fundamental law * * *." Hanover National Bank v. Moyses, 186 U.S. 181, 192, 22 S.Ct. 857, 862, 46 L.Ed. 1113.
 
 
 20
 The basis for Section 522(f) is both rational and compatible with fundamental law. Section 522(f) was enacted as part of a larger program "to make (traditional bankruptcy protections) more effective for non-business debtors." 123 Cong.Rec. 35444 (1974) (statement of Rep. Rodino). Since the previous major revision of the bankruptcy laws in 1938, consumer financing had burgeoned into a major industry, and consumer bankruptcies had come to account for nearly 90% of all bankruptcy cases filed. Id.; H.R.Rep.No. 595, 95th Cong., 1st Sess. 4, 116 (1977). The existing bankruptcy law, however, had been addressed primarily to the problems involved in business bankruptcies and had relied on state exemption laws to protect consumer debtors. The state exemptions were quickly outmoded[7] as creditors "developed techniques that enable(d) them to avoid the effects of a debtor's bankruptcy." H.R.Rep.No. 595 at 116-117, U.S.Code Cong. & Admin.News 1978, p. 6077.
 
 
 21
 In particular, security interests in consumer property, which formerly had been difficult to establish, became widespread following adoption of Article Nine of the Uniform Commercial Code in the middle 1960's. See Schwartz, Security Interests and Bankruptcy Priorities: A Review of Current Theories, 10 J. Legal Stud. 1, 4-6 (1981). The result was that consumer debtors often came out of the bankruptcy proceedings "little better off than they were before." Id. at 117, U.S.Code Cong. & Admin.News 1978, p. 6077.[8]
 
 
 22
 Finding that "there is a Federal interest in seeing that a debtor that goes through bankruptcy comes out with adequate possessions to begin his fresh start" (H.R.Rep.No. 595 at 126, U.S.Code Cong. & Admin.News 1978, p. 6087), Congress established a framework to ensure that debtors would not be left completely destitute after bankruptcy. Congress began by providing a system of federal exemptions upon which a debtor might rely as an alternative to less favorable state exemptions. See 11 U.S.C. §§ 522(b), 522(d); H.R.Rep.No. 595 at 126-127. Congress was aware, however, that the existence of a right to exempt certain property from the bankrupt estate was not alone sufficient to provide a fresh start for the debtor. The Report of the Commission on Bankruptcy Laws of the United States advised Congress that valid exemptions often had been lost or denied under prior law, and recommended that neither waivers of exemptions nor nonpurchase-money security interests in household goods, wearing apparel, and health aids be enforceable. H.R.Doc.No. 137, 93d Cong., 1st Sess., Part I at 169, 170, 173 (1973). Congress enacted the Commission's recommendations; Section 522(e) makes unenforceable a waiver of exemptions and, as noted above, Section 522(f)(2) allows the bankrupt to avoid a nonpossessory, nonpurchase-money lien in certain household and personal goods.
 
 
 23
 The House Report explained why it was necessary for the debtor to be able to avoid such liens:
 
 
 24
 Frequently, creditors lending money to a consumer debtor take a security interest in all of the debtor's belongings, and obtain a waiver by the debtor of his exemptions. In most of these cases, the debtor is unaware of the consequences of the forms he signs. The creditor's experience provides him with a substantial advantage. If the debtor encounters financial difficulty, creditors often use threats of repossession of all of the debtor's household goods as a means of obtaining payment.
 
 
 25
 In fact, were the creditor to carry through on his threat and foreclose on the property, he would receive little, for household goods have little resale value. They are far more valuable to the creditor in the debtor's hands, for they provide a credible basis for the threat, because the replacement costs of the goods are generally high. Thus, creditors rarely repossess, and debtors, ignorant of the creditors' true intentions, are coerced into payments they simply cannot afford to make.
 
 
 26
 The exemption provision allows the debtor, after bankruptcy has been filed, and creditor collection techniques have been stayed, to undo the consequences of a contract of adhesion, signed in ignorance, by permitting the invalidation of nonpurchase money security interests in household goods. Such security interests have too often been used by overreaching creditors. The bill eliminates any unfair advantage creditors have.
 
 
 27
 H.R.Rep.No. 595 at 127 (footnote omitted), U.S.Code Cong. & Admin.News 1978, p. 6088. See also In re Pillow, 8 B.R. 404, 406 (Bkrtcy.D.Utah 1981). Under the rule in Long v. Bullard, 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004, a lien even in exempt property survives the bankruptcy discharge. Since Congress specifically stated that it was adhering to this rule (H.R.Rep.No. 595 at 361), without the lien-avoidance provisions of Section 522(f), liens such as Thorp's would remain enforceable after the close of the bankruptcy proceedings.
 
 
 28
 Section 522(f) is narrowly drawn to permit avoidance only of nonpossessory, nonpurchase-money security interests in the listed items and only to the extent that these items are exempted property under Section 522(b). Section 522(f) is thus neither an irrational nor arbitrary means of effectuating a legitimate Congressional purpose under the bankruptcy laws-giving debtors " 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.' " Perez v. Campbell, 402 U.S. 637, 648, 91 S.Ct. 1704, 1710, 29 L.Ed.2d 233 (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230).[9] Thorp nevertheless argues that Section 522(f) will have the supposedly irrational effect of reducing nonpurchase-money credit extended to consumers such as the Giffords, as finance companies such as Thorp withdraw from the market. Indeed, all bankruptcy legislation makes borrowing by potential future bankrupts more difficult or expensive. See R. Posner, Economic Analysis of Law 293 (2d ed. 1977). "If Congress goes too far in undermining the security for extensions of credit when exercising plenary legislative power under the bankruptcy clause, the result may be that credit will be unavailable. But that is a matter of policy judgment for the legislative branch." In re Ashe, supra, 669 F.2d at 111. We see no reason based on substantive due process to substitute our views "on the subject of Bankruptcies" (n. 6 supra) for those of Congress.
 
 V
 
 29
 The remaining issue is whether avoidance of Thorp's pre-enactment security interest is an uncompensated taking proscribed by the Fifth Amendment.
 
 
 30
 There is no " 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631. Rather than employing some single test of fairness (e.g., Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv.L.Rev. 1165 (1968)) or economic efficiency (e.g., Berger, A Policy Analysis of the Taking Problem, 49 N.Y.U.L.Rev. 165, 185-191 (1974)), a taking analysis is bound up with the particular facts of each case. Nevertheless,
 
 
 31
 (i)n engaging in these essentially ad hoc, factual inquiries, the (Supreme) Court's decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. See Goldblatt v. Hempstead, (369 U.S. 590,) 594 (82 S.Ct. 987, 990, 8 L.Ed.2d 130). So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, see, e.g., United States v. Causby, 328 U.S. 256 (66 S.Ct. 1062, 90 L.Ed. 1206) (1946), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.
 
 
 32
 Penn Central, supra, 438 U.S. at 124, 98 S.Ct. at 2659. Again, in Kaiser Aetna v. United States, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332, the Supreme Court prescribed the two factual foci for a taking determination: "(1) the economic impact of the regulation, its interference with reasonable investment backed expectations and (2) the character of the governmental action * * *." Application of those factors to Thorp's security interest in the Giffords' household goods shows that the lien avoidance permitted by Section 522(f) does not contravene the taking clause.
 
 The "Property" Interest Affected
 
 33
 First, the "investment backed expectations" interfered with are less than substantial. The cases that Thorp cites in which the Supreme Court found unconstitutional takings of liens are distinguishable because they involved much more substantial interests. Thorp's nonpossessory, nonpurchase-money security interest is far from "property" of the same importance as the farm mortgages taken in Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, or the materialmen's liens on ships taken in Armstrong v. United States, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554. The types of liens in Radford and Armstrong attach to property of the debtor that has directly benefited from the loan or work done. A farm, for example, is mortgaged to buy land, seed, fertilizer or tools. A materialman's lien attaches to a ship because the materialman has supplied the ship with material or labor. In either case, if the underlying debt is unpaid the creditor has a direct property interest in the objects that were purchased or created with the loaned capital or effort.
 
 
 34
 In contrast to such purchase-money interests, Thorp's expectations reside in the threat of foreclosure rather than in the collateral. Unlike the advances in Radford and Armstrong, the borrowed money here was not lent to purchase or improve the household goods listed in the security agreement. The Thirteenth Amendment prohibition against slavery and involuntary servitude prevents a creditor from taking a property interest in the direct beneficiary of his loan, the consumer. Therefore, as here, the creditor must settle for a security interest unrelated to the debt, such as in home furnishings needed by the consumer for ordinary living, and the creditor's "reasonable investment backed expectations" are reduced accordingly. As several bankruptcy courts have recognized:
 
 
 35
 (1) there is no direct relationship between the value of the household goods taken as collateral for the consumer loan and the amount of the loan as exists (, for example,) in a mortgage of real estate; (2) the value of the household goods is often nominal whereas realty has a measurable value comparable to the amount of the loan secured; and (3) the lender making small consumer loans, unlike a mortgagee, does not view a security interest in household goods as a potential substitute for the debt. * * * (T)hese courts have concluded that, since the household goods given as security have little or no actual monetary value to the creditor, whatever property interest the creditor has in the collateral does not rise to the level of a mortgagee's property rights in realty.
 
 
 36
 Matter of Ward, 14 B.R. 549, 561 (S.D.Ga.1981), summarizing In re Pillow, 8 B.R. 404, 418-420 (Bkrtcy.D.Utah 1981); In re Goodrich, 7 B.R. 590 (Bkrtcy.S.D.Ohio 1980); In re Webber, 7 B.R. 580, 584-586 (Bkrtcy.D.Or.1980); In re Curry, 5 B.R. 282 (Bkrtcy.N.D.Ohio 1980); and In re Rutherford, 4 B.R. 510 (Bkrtcy.S.D.Ohio 1980).[10]
 
 
 37
 Thorp contends that the market value of the collateral is irrelevant to whether its security interest should be characterized as "property" and whether the government must pay for an injury to the security interest. The intervenor United States, on the other hand, argues that Thorp's lien is merely an incident to a contractual right to repayment of a debt. Of course, the academic difference between contract and property rights is that the federal government may freely impair only the former, and even among private persons, contract rights are freely avoidable at "market value" whereas the owner of a property right may demand any payment to release the right or refuse to part with the property at any price. See Calabresi & Melamed, Property Rules, Liability Rules and Inalienability: One View of the Cathedral, 85 Harv.L.Rev. 1089 (1972). The "property" interest that Thorp asserts here is that it should be allowed to continue threatening to take possession of the household goods as a means of inducing the Giffords to repay the $3,000. The value of such a "property" interest is independent of the "contract" value of the lien, i.e., the actual market value of the household goods. By failing to request the United States to compensate for the alleged taking, Thorp in effect concedes that it has no interest in the latter amount.[11] Moreover, Congress found during its legislative fact-gathering that creditors such as Thorp have no intention of repossessing the collateral.[12]
 
 
 38
 The taking clause confuses Thorp's dichotomy between contract and property, however, insofar as it would permit the government to take liens for a public purpose upon payment of only "just compensation." Under the taking clause, the value of Thorp's security interest can in no event be greater than its fair market or "just" value, which would be the market value of the collateral. See Cudahy Bros. Co. v. United States, 155 F.2d 905, 906-907 (7th Cir. 1946) ("just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined"); In re Pillow, 8 B.R. 404, 411 (Bkptcy.D.Utah 1981) ("Historically, lien rights have entitled their holders to the value of collateral and no more in bankruptcy"). There would be no justice in compensating Thorp based on some extortion value of the security interest. See Gordon, Unconscionability in Bankruptcy: The Federal Contribution to Commercial Decency, 66 Nw.U.L.Rev. 741, 765 (1972). Thorp knew[13] or should have known[14] at the time it entered into this security agreement that Congress was in the process of amending the bankruptcy laws to permit avoidance of such security interests. At best, assuming the courts would hold that Section 522(f) effects a taking, Thorp might have anticipated recovering as "just compensation" the value of the collateral. But since by all estimates the value of the collateral involved here is insignificant, Thorp's "reasonable investment backed expectations" were insignificant also.
 
 
 39
 Even if the label "property interest" is not illusory, the impact of Section 522(f) upon Thorp's lien is insubstantial. First, Section 522(f) allows avoidance of a lien only to the extent that the debtor has an exemption under Section 522(b), here for up to $200 per item. The lien is not avoidable beyond that amount, and accordingly Section 522(f) only minimally affects a creditor whose investment-backed expectations reside in truly valuable collateral. Second, Section 522(f) does not apply until there is a bankruptcy, by which time the creditor's expectations of repayment are surely at a minimum. In this case, Thorp had some 20 months following enactment of Section 522(f) prior to the Giffords' bankruptcy during which to watch the Giffords more closely, and in the case of their default to enforce the security interest or threaten to do so. Although we do not know the facts in the instant case, ordinarily we might suppose that a debtor misses payments and is dunned by his creditors prior to filing for bankruptcy. If that were the case here, this particular lending agreement would have allowed Thorp to demand immediate repayment of the outstanding indebtedness. Thorp might also have attempted to negotiate a different lien on non-exempt property of the Giffords. Cf. Texaco, Inc. v. Short, --- U.S. ----, 102 S.Ct. 781, 792-93, 70 L.Ed.2d 738 (1982) (Indiana Mineral Lapse Act does not effect a taking because plaintiff failed to take advantage of an opportunity to take action that would have prevented loss). Finally, Congress has not entirely destroyed Thorp's expectation of repayment but instead has substituted for it the rights of an unsecured creditor, which need not be equal in value to the expectations allegedly taken. "While these rights may well not have constituted 'just compensation' if a 'taking' had occurred, the rights nevertheless undoubtedly mitigate whatever financial burdens the law has imposed on (Thorp) and, for that reason, are to be taken into account in considering the impact of the regulation." Penn Central, supra, 438 U.S. at 137, 98 S.Ct. at 2666. Together, these elements indicate that Section 522(f) is a de minimis interference that does not rise to the level of a taking under the Fifth Amendment.
 
 The Character of the Government Action
 
 40
 Regarding the character of the government action, Section 522(f) is a dual adjustment of benefits and burdens between the debtor and his creditors, and among a narrow class of secured creditors and the debtor's general creditors. The rationality of this adjustment of benefits and burdens between debtor and creditor was discussed in this opinion's substantive due process section supra. We note that the adjustment among the different types of creditors is rational also. It seems unlikely that Thorp had a significantly greater expectation of repayment than the Giffords' other unsecured creditors, such as unsecured retailers, landlords, and credit-card companies. It is even more unlikely that any difference in expectations should be allowed a veto over Congress' plenary power to make bankruptcy law. A fair reordering such as this of the competing claims of creditors to available funds of a bankrupt should be immune to a taking challenge. See Sax, Takings, Private Property and Public Rights, 81 Yale L.J. 149, 161 (1971).
 
 
 41
 The government action here is not of the nature of a physical invasion since Section 522(f)(2) does not apply to lenders who have possession of the collateral pursuant to possessory security interests. Common sense suggests a distinction between interfering with a limited class of Uniform Commercial Code remedies for nonpayment of debt by a bankrupt, and such governmental actions as bolting cable television equipment onto the roof of a building, Loretto v. Teleprompter Manhattan CATV Corp., --- U.S. ----, 102 S.Ct. 3164, 73 L.Ed.2d 868, allowing the public to use a formerly private pond, Kaiser Aetna v. United States, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332, or ousting a tenant from his leasehold, United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311; Devines v. Maier, 665 F.2d 138 (7th Cir. 1981). The former is impairment of an abstract incident to a contract right, while the latter are physical invasions of tangible property. The type of lien here is a property right in the broad sense that, except for the government's right to condemn for a public purpose, its holder may in certain circumstances exclude others from enjoying particular resources. But such a lien is not a property right in the sense that its holder possesses anything more than a bare legal title, or ever anticipates taking possession of the underlying collateral except perhaps as needed to make its more profitable threats of repossession credible. Our conception of property has not become so liberal that we can no longer distinguish, at least in narrow instances such as these, between property interests that are manifested by possession and transferred by delivery, and property interests merely photocopied onto the backside of consumer loan agreements.
 
 
 42
 Nor does Section 522(f) inure to the government's own benefit. Thus this case is again distinguishable from Armstrong, supra, where the government "took" materialmen's liens that encumbered government-owned ships. As the Third Circuit has stated as to the takings dichotomy, Section 522(f) is ordinary "economic regulation rather than a taking for public use." In re Ashe, supra, 669 F.2d at 110.
 
 
 43
 In deciding whether this character of action is a taking, we must remember that an affirmative answer would either force significant abandonment of the Congressional purpose or entail Congressional compensation for disappointed lenders.
 
 
 44
 Suffice it to say that government regulation-by definition-involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by purchase. "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413 (43 S.Ct. 158, 159, 67 L.Ed. 322) (1922).
 
 
 45
 Andrus v. Allard, 444 U.S. 51, 65 (100 S.Ct. 318, 326, 62 L.Ed.2d 210). Congress must have the freedom to adjust benefits and burdens when it acts pursuant to its bankruptcy powers, because-again, by definition-there are always too few funds of the bankrupt to make all of the creditors whole. The Fifth Amendment taking clause does not require Congress to be the guarantor of defaulting debtors.
 
 
 46
 Therefore, the order of the three-judge bankruptcy court allowing avoidance of Thorp's security interest is affirmed.
 
 
 47
 PELL, Circuit Judge, dissenting.
 
 
 48
 When a judge of a court of appeals has written a majority opinion for the court[1] and finds after an en banc rehearing that he not only has no votary among the other active judges of the court but, indeed, he has no reluctant followers, he would be foolish if he did not assiduously reexamine the pinions of his previously held opinion. I have done so and have concluded that to abandon what I sincerely believed to be a proper and required result would be also an abandonment of my duty as a judge. I do not launch on the preparation of a dissent with any feeling of quixotic disregard for reality for I regard the result reached by the majority opinion as eviscerating a fundamental principle of our constitution, the taking of property without compensation. The result reached in this case may be pleasing to the zealous believers in a fresh start for bankrupts but I cannot believe it has been realized without sacrificing a basic concept. I therefore respectfully dissent.
 
 
 49
 As the majority properly notes, the "first question" in this case is whether Congress intended section 522(f)(2) to apply to security interests that attached prior to November 6, 1978, the enactment date of the Bankruptcy Reform Act of 1978. I am persuaded that retrospective application of section 522(f) (2) would give rise to grave constitutional questions under the takings clause of the Fifth Amendment and that the statute should therefore be construed to apply prospectively only, in light of the strong policy mandate, reemphasized by the Supreme Court in NLRB v. Catholic Bishop, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), that courts construe statutes in a manner that, if possible, avoids constitutional questions. See, e.g., Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 296-97, 76 L.Ed. 598 (1932); Murray v. The Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804); 2A C. Sands, Sutherland Statutory Construction § 45.11 (4th Ed. 1973). Indeed, the Court has repeatedly emphasized "that the words of a statute may be strained 'in the candid service of avoiding a serious constitutional doubt.' United States v. Rumely, 345 U.S. 41, 47 (73 S.Ct. 543, 546, 97 L.Ed. 770) (1953)." United States v. Seeger, 380 U.S. 163, 188, 85 S.Ct. 850, 865, 13 L.Ed.2d 733 (Douglas, J., concurring); Blodgett v. Holden, 275 U.S. 142, 148, 48 S.Ct. 105, 107, 72 L.Ed. 206 (1927) (Holmes, J., concurring).
 
 
 50
 In NLRB v. Catholic Bishop, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), the Supreme Court emphasized the proper mode of analysis of a Congressional enactment which is claimed to be unconstitutional. The Catholic Bishop Court had before it the question of whether lay teachers in church-operated schools were within the jurisdiction of the NLRB. The Court found that neither the language nor the legislative history of the National Labor Relations Act disclosed "an affirmative intention ... clearly expressed," that the NLRB have such jurisdiction. Absent such clear expression of Congressional intent to bring teachers within the NLRB's jurisdiction, the Court declined to construe the Act in a manner that would require the resolution of "difficult and sensitive questions arising out of the guarantees of the First Amendment Religion Clauses." 440 U.S. at 507, 99 S.Ct. at 1322. We turn first, therefore, to examination of whether retrospective application of § 522(f)(2) would give rise to such serious constitutional questions under the Fifth Amendment.
 
 I.
 
 51
 The Constitution confers broad powers upon Congress to establish "uniform Laws on the subject of Bankruptcies." U.S.Const. Art. I, § 8, cl. 4. Congress has acted under this broad grant to enact various statutes which have applied to rights which predated their enactment. See, e.g., Hanover National Bank v. Moyses, 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113 (1902) (Bankruptcy Act of 1898 discharged plaintiff's 1892 judgment against debtor); In re Prima Co., 88 F.2d 785 (7th Cir. 1937) (Congress intended Bankruptcy Code to confer on bankruptcy courts the power to issue trustee certificates with priority over existing mortgages).
 
 
 52
 The Bankruptcy Reform Act of 1978, a comprehensive revision of the entire bankruptcy system, was enacted in the exercise of this broad bankruptcy power. It applies to many rights and transactions which took place before its enactment, saving only those cases commenced under the old bankruptcy law. See, e.g., 11 U.S.C. § 365(b)(2) (invalidates bankruptcy clauses in executory contracts and unexpired leases); 522(e) (makes contractual waivers of exemptions unenforceable by unsecured creditors); 524(c) (contractual reaffirmations of debts unenforceable in some circumstances).
 
 
 53
 Courts have acknowledged the scope of the bankruptcy power as extending to all legislation regarding the discharge of contractual debts and distribution of the debtor's assets. See, e.g., Kuehner v. Irving Trust Co., 299 U.S. 445, 451, 57 S.Ct. 298, 301, 81 L.Ed. 340 (1937); Hanover National Bank, 186 U.S. at 186, 22 S.Ct. at 860. It is also settled, however, that the bankruptcy power is not without limitation, but rather is subject to the constitutional limits of the Fifth Amendment. Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 589, 55 S.Ct. 854, 863, 79 L.Ed. 1593 (1935); Rodrock v. Security Industrial Bank, 642 F.2d 1193, 1197 (10th Cir. 1981), prob. juris. noted, --- U.S. ----, 102 S.Ct. 969, 71 L.Ed.2d 108; In re Penn Central Transportation Co., 494 F.2d 270, 278 (3d Cir. 1974), cert. denied, 419 U.S. 883, 95 S.Ct. 147, 42 L.Ed.2d 122. The focus of our inquiry at this juncture must be whether application of § 522(f)(2) to preenactment liens presents a significant risk of overstepping those constitutional limitations.
 
 
 54
 In Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935), the Supreme Court found that the Frazier-Lemke Act of 1934, which by its terms applied retroactively, conflicted with the Fifth Amendment, and was therefore void. The Act was designed to save family-owned farms from foreclosure by permitting a debtor to obtain a five-year stay of state foreclosure proceedings, to remain on the farm during the stay if he paid a reasonable rent, and to satisfy the mortgagee's claim at any time within the five-year period by paying the mortgagee the appraised value of the property.
 
 
 55
 The Radford Court noted the broad power of Congress to discharge a debtor's personal obligations, but concluded:
 
 
 56
 the effect of the Act here complained of is not the discharge of ... personal obligation. It is the taking of substantial rights in specific property acquired by the Bank prior to the Act.
 
 
 57
 ....
 
 
 58
 The province of the Court is limited to deciding whether the ... Act ... as applied has taken from the Bank without compensation, and given to Radford, rights in specific property which are of substantial value.... As we conclude that the Act as applied has done so, we must hold it void. For the Fifth Amendment commands that, however great the Nation's need, private property shall not thus be taken even for a wholly public use without just compensation.
 
 
 59
 295 U.S. at 589-90, 601-02, 55 S.Ct. at 863-64, 868-69 (citations omitted).[2]
 
 
 60
 The bankruptcy courts which have considered the constitutionality of section 522(f)(2) have split on the constitutionality of retrospective application. A substantial number have relied on the Radford rationale to find that section 522(f)(2) constitutes a taking. See, e.g., Glynn v. Household Finance Corp., 13 B.R. 647 (D.S.C.1981); Carroll v. Household Finance Corp., 11 B.R. 45 (Bkrtcy.E.D.N.Y.1981); In re Cunningham, 17 B.R. 463 (Bkrtcy.W.D.Ky.1981); In re Coleman v. American Finance Corp., 10 B.R. 772 (Bkrtcy.D.Md.1981). A similar number have upheld the validity of the section. See, e.g., Hinson v. Lexington State Bank, 20 B.R. 753 (Bkrtcy.D.S.C.1982); Lucas v. Beneficial Finance Co., 18 B.R. 179 (Bkrtcy.S.D.Ohio 1982); Safeway Finance Co. v. Ward, 14 B.R. 549 (S.D.Ga.1981); Curry v. Associates Financial Services, 11 B.R. 716 (N.D.Ohio 1981); Clark v. Savings & Trust Co., 11 B.R. 828 (Bkrtcy.W.D.Pa.1981). The courts of appeals which have considered the question have split on the constitutionality of retroactive application. Rodrock v. Security Industrial Bank, 642 F.2d 1193 (10th Cir. 1981), prob. juris. noted, --- U.S. ----, 102 S.Ct. 969, 71 L.Ed.2d 108 (unconstitutional); In re Ashe, 669 F.2d 105 (3d Cir. 1982) (§ 522(f)(1) constitutional); see Webber v. Credithrift, 674 F.2d 796 (9th Cir. 1982) (Act constitutional when applied to postenactment, preeffective liens; implies unconstitutional if applied to preenactment liens).
 
 
 61
 Of the courts upholding the constitutionality of the section, most have analyzed the section not in terms of a taking, but rather have relied on a highly expansive conception of the bankruptcy power, and a due process, rather than a takings analysis.[3] See, e.g., Ashe, 669 F.2d at 110-11, see Note, Constitutionality of Retroactive Lien Avoidance under Bankruptcy Code Section 522(f), 94 Harv.L.Rev. 1616, 1621 & nn. 36-42 (1981). I am persuaded that the better reasoned analysis focuses on the taking clause and the Radford case.
 
 
 62
 In Rodrock v. Security Industrial Bank, 642 F.2d 1193 (10th Cir. 1981), prob. juris. noted, --- U.S. ----, 102 S.Ct. 969, 71 L.Ed.2d 108, the Court of Appeals for the Tenth Circuit analyzed section 522(f)(2) under the Radford case. The court reasoned:
 
 
 63
 In the instant cases, the creditors acquired rights in specific property prior to the enactment of the Reform Act, and, under Radford, these vested rights cannot be taken from the creditor for the benefit of the debtor. It should be noted that, in the instant cases, there would be a complete taking of the secured creditors' property interests.
 
 
 64
 642 F.2d at 1197. The Rodrock court was also faced with the argument raised by the debtors here, that Radford has been discredited by a series of subsequent Supreme Court decisions. As the Giffords point out, Radford did not expressly rely on the taking clause of the Fifth Amendment, although the language of the opinion of the Court would seem so to indicate. Subsequent Supreme Court cases have seemed to treat Radford as a substantive due process case, and are silent on the taking issue. Wright v. Union Central Life Insurance Co., 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940); Wright v. Vinton Branch, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937); see Helvering v. Griffiths, 318 U.S. 371, 400-01 n.52, 63 S.Ct. 636, 652 n.36, 87 L.Ed. 843 (1943). While these later cases do indeed circumscribe the application of Radford, and erode the substantive due process test it arguably applied, it is also clear that, "The Supreme Court ... has never repudiated the principle that the value of a security interest in specific property is a fifth amendment property right that cannot be taken unless just compensation is given." Note, 94 Harv.L.Rev., supra, at 1624. Note, The Continuing Vitality of Louisville Joint Stock Land Bank v. Radford, 15 Ind.L.Rev. 593 (1982).
 
 
 65
 The Supreme Court has continued to cite Radford for the proposition that the Government may not take a property interest without just compensation. See, e.g., Armstrong v. United States, 364 U.S. 40, 44, 80 S.Ct. 1563, 1566, 4 L.Ed.2d 1554 (1960). It is also worthy of note, although perhaps not conclusive, that Congress apparently considered Radford still vital at the time of the passage of the Bankruptcy Reform Act. S.Rep.No. 95-989, 95th Cong., 2d Sess. 49, 76, reprinted in (1978) U.S.Code Cong. & Ad.News 5787, 5835, 5862 (citing Radford with approval); H.R.Rep.No. 95-595, 95th Cong., 2d Sess. 339, 361, reprinted in (1978) U.S.Code Cong. & Ad.News 5963, 6295, 6317. We therefore agree with the Rodrock court that subsequent Supreme Court decisions, "may well refine ..., but ... do not destroy the fundamental teaching of Radford that Congress may not under the bankruptcy power completely take for the benefit of a debtor rights in specific property previously acquired by a creditor." 642 F.2d at 1198.
 
 
 66
 As Rodrock makes clear, the continuing vitality of Radford raises substantial and significant Fifth Amendment questions concerning retrospective application of section 522(f)(2). Because I see no escape from the question whether a taking has occurred if section 522(f)(2) is applied to liens which attached under state law to specific property prior to the enactment date of the Act, I believe it is appropriate to turn to an examination of the statute to decide whether it was the affirmatively expressed intent of Congress that the statute be read to apply retrospectively and thus require resolution of the constitutional question, or whether it can be construed to apply prospectively only.
 
 II.
 
 67
 As the majority opinion correctly points out, section 522(f)(2) does not state whether it is to apply retrospectively. As is the case with the rest of the new Act, the only express temporal limits on application of the section are found in the transition provisions of section 401 and 402(a), which except from the coverage of the new Act only those cases commenced prior to October 1, 1979, the effective date of the new Act. I do not, however, view this as dispositive of the question whether Congress intended section 522(f)(2) to apply to preenactment liens.[4] As the Supreme Court pointed out long ago:
 
 
 68
 frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act.
 
 
 69
 Church of the Holy Trinity v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892). The Holy Trinity Court held that where reliance on the "plain meaning" of the statute led to an absurd result, resort to legislative history and other extrinsic aids to construction is appropriate, and their interpretative value may be controlling. In this case, where application of the general rule of sections 401 and 402(a) to section 522(f)(2) would lead to a result I believe would not be merely absurd, but in violation of the Constitution, resort to such aids to ascertain whether such a result was indeed the intent of the legislature is not only advisable, it is compelled. See, e.g., United States v. Clark, 445 U.S. 23, 27-31, 100 S.Ct. 895, 899-901, 63 L.Ed.2d 171 (1980). I turn therefore, to examine the legislative history of the 1978 Act to determine whether its broad sweep was intended to include the avoidance of preenactment liens.
 
 
 70
 First, changes in the preliminary drafts of the transition provisions suggest that Congress did not intend retrospective application of section 522(f)(2). As the majority opinion points out, preliminary drafts of the sections expressly required retrospective application. William Plumb, Jr., a consultant to the Commission on Bankruptcy Law of the United States, pointed out in hearings before the House that such a provision could be viewed as an improper impairment of property rights if given retrospective effect. Bankruptcy Act Revision: Hearings on H.R. 31 and H.R. 32 Before the House Subcomm. on Civil and Constitutional Rights, 94th Cong., 1st Sess. 2034, 2066-67 (1976). The provision requiring retroactivity was then stricken from the language of the transition provisions, and the present language inserted in its place. I find this persuasive evidence that Congress recognized the Fifth Amendment limitations on the Bankruptcy power, and sought to stay within them. Cf. Bradley v. School Board, 416 U.S. 696, 716 n.23, 94 S.Ct. 2006, 2018 n.23, 40 L.Ed.2d 476 (1974) (when Congress struck language limiting the award of attorneys' fees to fees incurred after the statute's effective date, the Court would not read such a limitation back into the statute). The majority's observation that Mr. Plumb was only one of many witnesses testifying before Congress does not dilute either the correctness of his conclusions, or the evidentiary force of the deletion of the retroactivity provisions.
 
 
 71
 Second, the absence of any express indication in the legislative history of section 522(f)(2) that Congress intended the section to apply to vested property rights in existence at the time of enactment is more evidence of Congressional sensitivity to the limits of the Bankruptcy power. Further demonstration of this recognition is reflected by repeated references to the Radford decision in both the House and Senate reports accompanying the Act, as noted previously herein.[5] I therefore conclude that there was no Congressional "affirmative intention ... clearly expressed," Catholic Bishop, 440 U.S. at 507, 99 S.Ct. at 1322, that the Act apply to preenactment security interests.
 
 
 72
 Having determined that retroactive application of the statute would give rise to serious constitutional questions, and that there is no specific Congressional mandate that the section be so applied, I would construe the statute to apply prospectively only, i.e., only to those liens which attached after the enactment date[6] of the statute, and conclude my analysis there.[7] As author of the opinion of this court in NLRB v. Catholic Bishop, 559 F.2d 1112 (7th Cir. 1977), aff'd on different grounds, 440 U.S. 490, 99 S.Ct. 1919, 59 L.Ed.2d 533 (1979), I am particularly aware of the Supreme Court's preference for reaching a decision on other than constitutional grounds. Because the entire thrust of the majority opinion is that the statute as applied to preenactment liens is constitutional, however, I too will proceed to address the constitutional questions such application presents.
 
 III.
 
 73
 Although the majority opinion correctly sets forth the analytical factors the Supreme Court has established for a non-physical invasion[8] takings case, I believe its attempt to apply those factors in a manner that distinguishes the Radford case[9] falls short of the mark. To rephrase the majority, the three key factors in a non-physical invasion takings case are: (1) the quality of the property interest asserted, or "the investment-backed expectation"; (2) the economic impact of the Governmental action; and (3) the character of the Governmental action. The majority opinion erroneously concludes that the creditor's expectation is illusory, the economic impact of the Governmental action is insubstantial, and that the Governmental action does not rise to the level of a taking because it is rational, not a physical invasion of the property, and does not inure to the Government's own benefit, but is rather "ordinary economic regulation," immune from a takings challenge. Because I am convinced that the majority incorrectly analyzes each of these three elements of the takings test, I respectfully dissent, and would conclude that retrospective application of section 522(f)(2) is unconstitutional and the statute is invalid to the extent it is so applied.
 
 A. The property interest affected
 
 74
 A lien or security interest in personal property gives a secured party substantial rights under Wisconsin law, including:
 
 
 75
 (1) the right to take possession and dispose of the collateral upon default; Wis.Stat.Ann. § 409.503 (West 1964);
 
 
 76
 (2) the rights to have the collateral sold, publicly or privately, and to buy the collateral at such sale; id. at § 409.504;
 
 
 77
 (3) the right to retain the collateral in satisfaction of the debt; id. at § 409.505.
 
 
 78
 It is well settled under state and federal law, see 11 U.S.C. § 101(28) (Supp. III 1978), that these rights, essentially indistinguishable from those adumbrated in Radford, see n.2, supra, constitute a "property interest" in the collateral to which they attach.
 
 
 79
 That such rights constitute a property interest rather than a contractual right to repayment is not merely an "academic difference," as the majority suggests. It is a fundamental difference in kind, and of constitutional significance. Kuehner v. Irving Trust Co., 299 U.S. 445, 451-52, 57 S.Ct. 298, 301, 81 L.Ed. 340 (1937) ("there is, as respects the exertion of the bankruptcy power, a significant difference between a property interest and a contract, since the Constitution does not forbid impairment of the obligation of the latter"). Kuehner pointed out that where a property right exists, the Radford holding remains controlling. The majority attempts to avoid that holding by distinguishing Thorp's property interest in the Gifford's property from that in Radford on two grounds: (1) the security interest in the instant case is not a purchase money security interest; and (2) the fair market value of the collateral is "insignificant," and the lien's value, therefore, inheres primarily in the threat of foreclosure. These differences do not factually distinguish this case from Radford. Even if one accepts that such a distinction may be made, it does not rise to a constitutionally significant level allowing the extinction of Thorp's property right.
 
 
 80
 Turning first to the purchase money/nonpurchase money distinction, I note that Radford itself did not involve a loan given to purchase a farm, but rather involved a second mortgage on the Radford's equity in their farm. 295 U.S. at 573-74 & nn. 3 & 4, 55 S.Ct. at 855-56 nn. 3 & 4. The majority's procrustean attempt to characterize the Radford loan as a purchase money loan on the grounds that it was used to purchase tools and seed which were used to benefit the burdened property is untenable. First, I find no indication in Radford as to the type of goods on which the loan was spent, and the majority's "seed and tools" hypothesis is thus entirely a matter of speculation. Second, the "used to benefit the property" distinction is essentially a matter of semantics depending on a broad definition of benefited property:[10] the characterization could as easily be applied to the instant case in which the proceeds of the loan benefited the entire Gifford household. Under the majority analysis, therefore, the attachment of liens to items of household goods, which after all are only a portion of the benefited property, should be acceptable to the same degree as in Radford. In neither case, however, can this be said to convert the lien to a purchase money security interest.[11] Thus this case simply cannot be distinguished from Radford on the basis of any purchase money/nonpurchase money dichotomy.[12]
 
 
 81
 The majority then attempts to distinguish this case from Radford on the basis that the market value of the collateral is insignificant, and only the "extortion value" of the security interest makes it of value to Thorp. I note initially that the fact that the market value of the collateral is substantially less than the debt it secures, again, does not distinguish the case factually from Radford. In Radford, the farm had a market value of $18,000 when credit of $9,000 was extended. At bankruptcy, however, the farm's value had deteriorated to $4,445. 295 U.S. at 573, 577, 55 S.Ct. at 855, 857. Thus foreclosure would not have resulted in complete satisfaction of the debtor's obligation. This did not justify the destruction of what security remained in Radford, and it cannot justify it here. See Armstrong v. United States, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) (unless secured claim is "valueless," it cannot be eliminated).
 
 
 82
 The heart of the majority's argument is the assertion that because the real value of the liens lies in the threat of foreclosure, there would be no justice in compensating Thorp for that element of value. Even if we should assume that the lenders who take a security interest in leasehold goods never intend to take possession of the tangible items (a fact which Thorp denies) but the only purpose of securing the lien is as leverage on the borrower to repay the money borrowed, it is departing from the real world to say that we are not dealing with valuable assets. The very purpose of any collateral whether it be in connection with a purchase-money transaction or be it a farm or a Mercedes sport car is to provide a compulsion for the borrower to repay. The retroactive application of section 522(f) is a taking of a valuable property and to argue otherwise is to ignore the basis on which a multibillion dollar lending business has operated. Thorp's preference of repayment to foreclosure does not, therefore, distinguish it from other creditors in any fundamental sense. All creditors take security to insure repayment, not primarily to substitute collateral for repayment. The fact that section 522(f)(2) creditors are perhaps more interested in repayment than in the taking possession of collateral than other creditors might be, although I doubt this is true,[13] distinguishes them only in degree, and cannot support the majority's constitutional distinction. See Note, 94 Harv.L.Rev., supra, at 1632.
 
 
 83
 The majority relies heavily on Congressional findings for the conclusion that such liens are rarely foreclosed upon, but rather are used as tools of coercion. Characterizing legally sanctioned rights as oppressive, however, does not entitle Congress to abrogate the protections of the Fifth Amendment. Excessive judicial deference to such Congressional definitions of what is and is not a property right would eviscerate the takings clause of the Fifth Amendment.
 
 
 84
 I am convinced, for all the above reasons, that the creditor's property interest here is indistinguishable from that involved in the Radford case. Thorp's expectation[14] was that it could retain its lien until the Giffords paid their debt, and that if they defaulted it would have certain specific rights under state law. It backed that reasonable expectation with an investment of some $3,000. I would hold that this satisfies the first element of the takings analysis.[15]
 
 B. The economic impact of the section
 
 85
 The Supreme Court has described this aspect of the takings analysis as based upon "the extent to which the regulation has interfered with distinct investment-backed expectations." Penn Central Transportation Co. v. New York, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). As the Rodrock court pointed out, section 522(f)(2) results in "a complete taking of the secured creditors' property interest." 642 F.2d at 1197. It substitutes the right of an unsecured creditor to share in the distribution of the debtor's remaining assets-a fundamentally different right of highly dubious worth in most consumer bankruptcies, see, e.g., Kuehner, 299 U.S. at 451-52, 57 S.Ct. at 301-02; Rodrock, 3 Bankr.Rptr. at 630 & n.2 (D.Colo.1980); Note, 94 Harv.L.Rev., supra, at 1631. This total obliteration of any property right in the collateral is the ultimate in impact. In my view, it satisfies the second element of the takings test. The majority, however, finds the impact de minimis on three grounds: (1) since the lien can only be avoided up to $200 per item, it has a minimal impact on creditors with truly valuable security; (2) a creditor's expectation of repayment is at a minimum once bankruptcy occurs; and (3) substitution of the rights of an unsecured creditor mitigates whatever impact the section has.
 
 
 86
 I am unwilling to accept, even in this inflationary age, the notion that $200 is per se a de minimis amount. Furthermore, although the worth of any given item of household goods may be under $200, the aggregate amounts involved in such transactions are considerably larger. Finance companies such as Thorp made 79,720 consumer loans in Wisconsin in 1978, totalling $148,408,699. Consumer Credit Division, Office of the Commissioner of Banking of Wisconsin.[16] Thus the dollars and cents impact of the majority's interpretation is substantial in the extreme.
 
 
 87
 Nor am I moved by the majority's contention that a secured creditor's expectations are at a minimum in bankruptcy. This may well be true of the unsecured creditor, but the secured creditor has always had the worth of his collateral or the collateral itself to fall back upon in case either of default or bankruptcy. See Wis.Stat.Ann. § 409.501 (West 1964) (Official UCC Comment: "The rights of the secured party in the collateral after the debtor's default are of the essence of a security transaction. These are the rights which distinguish the secured from the unsecured lender"); Long v. Bullard, 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004 (1886) (secured creditor's lien protected in bankruptcy). Thus only if we assume the majority's conclusion that 522(f)(2) applies would the creditor's expectation of retaining that protection vanish. I reject this essentially circular argument, as well as the contention that Thorp could have avoided this loss by careful monitoring of its accounts or renegotiation of the loan. There is no indication in the record that the Giffords defaulted prior to bankruptcy. Thorp had no rights under state law absent such default to control the collateral or the Giffords' spending. While the renegotiation for other collateral suggestion sounds appealing, I question its plausibility. What bargaining power would Thorp have had to seek additional or substitute collateral in the absence of any extension of additional credit; and if it felt additional collateral was needed because of the risk of default such an extension would certainly seem to have been commercially foolhardy.
 
 
 88
 Nor does the somewhat frivolous suggestion of the substitution of the rights of an unsecured creditor mitigate the impact of section 522(f)(2) on Thorp's property interest. As noted above, an unsecured claim differs fundamentally in kind and in value from a secured claim. An unsecured claim in a consumer bankruptcy is generally worthless.[17] See supra. Substitution of these utterly illusory rights has the same effect as complete destruction of the property right, and cannot mitigate the section's economic impact. See Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 414-15, 43 S.Ct. 158, 159-60, 67 L.Ed. 322 (1922).
 
 C. The character of the Government action
 
 89
 Finally, I am persuaded that the character of the Government action fulfills the requirements of this final element of the takings analysis.[18] The recent cases of Kaiser Aetna v. United States, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); Penn Central Transportation Co. v. New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); and Andrus v. Allard, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), have suggested a two-tier takings analysis in a non-physical invasion case:
 
 
 90
 Where a statute deprives an individual of all his rights in specific property, the Court is likely to find a compensable taking .... When a statute takes only some of an owner's rights, the Court will give particular weight to the magnitude of the economic harm and to the reasonableness of the owner's investment-backed expectation of the security that property rights give.
 
 
 91
 Note, 94 Harv.L.Rev., supra at 1634 (footnotes omitted). Under this analysis, section 522(f)(2) fails to pass even the first tier. Id. Because the section completely destroys the creditor's property rights in specific collateral, its retrospective application violates the takings clause of the Fifth Amendment.
 
 
 92
 The majority also errs in its conclusion that because the Government activity is not in the nature of a physical invasion, it is not a taking. First, I note that the section deprives the creditor of his state law rights to take possession of the collateral on default. Thus the section can be characterized as working a physical invasion. Cf. Kaiser Aetna, 444 U.S. at 179-80, 100 S.Ct. at 392-93 (taking of the right to exclude the public from private property constituted a physical invasion, and hence a Fifth Amendment violation). In this light the section is again clearly unconstitutional under the per se takings analysis recently employed in Loretto v. Teleprompter Manhattan CATV Corp., --- U.S. ----, 102 S.Ct. 3164, 73 L.Ed.2d 868 (U.S.1982). Second, even if one accepts the majority's nonphysical invasion characterization, the takings question does not depend on a narrow interpretation of a physical seizure of property. The hallmark is the deprivation of the former owner. United States v. General Motors Corp., 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945).
 
 
 93
 Nor is it necessary that the property inure to the benefit of the Government. See, e.g., id.; Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922) (benefit of statute inured to private homeowners); Devines v. Maier, 665 F.2d 138, 141-42 (7th Cir. 1981).
 
 
 94
 In sum, if I were required to reach the constitutional question, a course I find imprudent, I would be forced to conclude that retrospective application of section 522(f)(2) violates the takings clause of the Fifth Amendment, and is therefore invalid. On that basis, and on the basis that the court erred in even reaching the constitutional question, I respectfully dissent.
 
 
 
 [1]
 Thorp has not argued on appeal that the Giffords' television sets or tape recorder should not be included as household furnishings, goods, or appliances. The dissent suggests that we are overly solicitous of the Giffords because their television sets and tape recorder are less essential to ordinary family living than most other items includible in Section 522(f)(2)'s enumeration. Dissent page 467 n.11. Query whether the dissent's analysis would be different had Thorp taken a nonpossessory, nonpurchase-money interest in a family pet or a home dialysis machine if needed by one of the Giffords' children
 
 
 [2]
 Unlike the dissent, we do not find Section 522(f) so "absurd" that we will require Congress to depart from its scheme of placing temporal directions in a single part of the Act and ask that it tell us when Section 522(f) in particular should apply. Since we conclude infra that Section 522(f) is not unconstitutional, postponing its application in order to avoid "serious constitutional questions" (dissent page 25) would be a most unjustified form of judicial activism. To paraphrase Jeremy Bentham, "As in a dunghill here and there a grain of corn, so in the mass of judicial statute-helping here and there a grain of reason." Bentham, 4 Works 494
 
 
 [3]
 The dissent makes a related argument that because Congress in its legislative history cited a Supreme Court decision invalidating 1934 bankruptcy legislation, Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, it must have believed Section 522(f) to be invalid also if applied to existing liens. Therefore, the dissent argues, Congress must have intended Section 522(f) not to apply to pre-enactment liens, or at least we would damage "no specific Congressional mandate" (dissent page 465) by construing it so
 With all respect the dissent turns pumpkins into carriages. The citation of a case in legislative history does not imply Congressional understanding or adoption of every proposition for which the case may arguably stand. Moreover, each citation of Radford in this legislative history is unconnected to any constitutional limitations upon Section 522(f). At one point, Radford is cited in connection with Section 522(c) (which provides that with certain exceptions property exempted under Section 522 is not liable for any prior debt of the debtor) by Senate Report No. 989, 95th Cong., 2d Sess. 76 and House Report No. 595, 95th Cong., 2d Sess. 361, reprinted in (1978) 5 U.S.Code Cong. & Ad.News 5787, 5862, 6316 for the proposition (stated identically in both reports) that "(t)he rule of Long v. Bullard, 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004 (1886), is accepted with respect to the enforcement of valid liens on nonexempt property as well as on exempt property." Long v. Bullard held that when "the creditor neither proved his debt in bankruptcy nor released his lien * * * his security was preserved notwithstanding the bankruptcy of his debtor." 117 U.S. at 620-621, 6 S.Ct. at 918. Both reports refer only to page 583 of the Radford opinion, where Long v. Bullard is cited as historical support for the same proposition: "But unless the mortgagee released his security, in order to prove in bankruptcy for the full amount of the debt, a mortgage even of exempt property was not disturbed by bankruptcy proceedings." 295 U.S. at 582-583, 55 S.Ct. at 859-60. Clearly, Congress cited these cases to explain its adoption of a technical bankruptcy rule in Section 522(c) as to exemptions but not to limit the effect of Section 522(f).
 Radford is also cited in connection with Section 361 (which deals with adequate protection of an interest of an entity in property) by Senate Report No. 989, 95th Cong., 2d Sess. 49 and House Report No. 595, 95th Cong., 2d Sess. 339, reprinted in (1978) 5 U.S.Code Cong. & Ad.News 5835, 6295 as one of the sources of the notion of "adequate protection" for secured creditors such as the mortgagee in Radford. Section 361 is not at issue on this appeal nor applicable to the present exemption. In any case, under Section 361 and according to the House Report, such adequate protection would not exceed the value of the collateral, which in this case is worth much less to the creditor than the threat of foreclosure on the security interest (see p. 457 infra).
 
 
 [4]
 "(N)or shall any person * * * be deprived of * * * property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S.Const. Amend. V
 
 
 [5]
 The Frazier-Lemke Act amended the post-Depression bankruptcy laws to permit farmers who defaulted on their mortgages to defeat actions to foreclose on their farms and remain in possession during a five-year foreclosure moratorium. The Act required the farmer to pay rent into court for the benefit of both secured and unsecured creditors and allowed the farmer to redeem his farm for its appraised value (rather than for the outstanding mortgage indebtedness) at any time during the five-year period. Pub.L.No. 486, ch. 869, 48 Stat. 1289 (1934); Radford, 295 U.S. at 575-576, 55 S.Ct. at 856-57. The Supreme Court invalidated the Act as an uncompensated taking of "rights in specific property which are of substantial value." 295 U.S. at 601, 55 S.Ct. at 869. As discussed infra, the purchase-money mortgages avoided in Radford are distinguishable from Thorp's lien because the former had "substantial value." But in any event, the holding in Radford has been greatly weakened by subsequent decisions. See Wright v. Vinton Branch of the Mountain Bank of Roanoke, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736; John Hancock Ins. Co. v. Bartels, 308 U.S. 180, 184 n.3, 60 S.Ct. 221, 223 n.3, 84 L.Ed. 176; Wright v. Union Central Life Ins. Co., 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184; Helvering v. Griffiths, 318 U.S. 371, 400-401 n.52, 63 S.Ct. 636, 651-52 n.52, 87 L.Ed. 843
 
 
 [6]
 "The Congress shall have Power * * * (t)o establish * * * uniform Laws on the subject of Bankruptcies throughout the United States." U.S.Const.Art. 1, § 8, cl. 4
 
 
 [7]
 Specifically, the House Report found:
 Under current law, what property is exempt is determined under State law. However, some State exemption laws have not been revised in this century. Most are outmoded, designed for more rural times, and hopelessly inadequate to serve the needs of and provide a fresh start for modern urban debtors. The historical purpose of these exemption laws has been to protect a debtor from his creditors, to provide him with the basic necessities of life so that even if his creditors levy on all of his nonexempt property, the debtor will not be left destitute and a public charge. The purpose has not changed, but neither have the level of exemptions in many States. Thus, the purpose has largely been defeated.
 H.R.Rep.No.595 at 126 (footnotes omitted), U.S.Code Cong. & Admin.News 1978, p. 6087. See also 123 Cong.Rec. 35452 (1977) (statement of Rep. Drinan).
 
 
 [8]
 In 1970 Congress established the Commission on the Bankruptcy Laws of the United States to investigate the need for bankruptcy law reform. Pub.L.No. 91-354, 84 Stat. 468. The Commission's Report (H.R.Doc.No. 137, 93d Cong., 1st Sess., Part I (1973)) and a report prepared by the Brookings Institution (D. Stanley & M. Girth, Bankruptcy: Problem, Process, Reform (1971)) both recommended reform of the laws governing consumer bankruptcies. Rep. Edwards, the primary House sponsor of the Bankruptcy Reform Act, explained that both reports had found that:
 (T)he debtor, while he might get a discharge in bankruptcy and be released from his debts, because of loopholes and difficulties with the law, he could find himself with a discharge that was not much good. He still would find after discharge that he owed too much money through nondischargeable debts or debts that he had been forced to reaffirm. Or he did not have enough property for a fresh start-the exemptions provided by the bankruptcy laws were inadequate.
 
 
 [123]
 Cong.Rec. 35446 (1977)
 
 
 [9]
 The Supreme Court has noted the importance of a system of exemptions in furthering this purpose. In Bronson v. Kinzie, 42 U.S. (1 How.) 311, 315, 11 L.Ed. 143, the Court held that the special status of household necessities permitted a state to provide in insolvency legislation that such items be exempt from execution on judgments, noting that "(r)egulations of this description have always been considered, in every civilized community, as properly belonging to the remedy, to be exercised or not by every sovereignty, according to its own views of policy and humanity." The items identified by the Court in 1843 as necessities parallel those items on which Section 522(f) (2) permits lien avoidance: "necessary implements of agriculture, or the tools of a mechanic, or articles of necessity in household furniture, (or) * * * wearing apparel * * *." 42 U.S. (1 How.) at 315
 
 
 [10]
 Wisconsin law establishing and regulating security interests also recognizes these distinctions between purchase- and nonpurchase-money types of liens. The Wisconsin Consumer Act, for example, which provides special protection for "consumer credit transactions," Wis.Stat.Ann. §§ 421.301(10), 422.102, does not apply to first mortgages on real estate, Wis.Stat.Ann. § 421.202(7); see also Miller, The Effect of WCA on Farm Credit, 46 Wis.Bar Bull. 20 (April 1973), or to "liens which arise by operation of law or by force of a mechanics' lien or similar statute * * *." Holbrook & Bugge, Creditor's Responsibilities and Duties Under the WCA, 46 Wis.Bar Bull. 37, 43 (Feb.1973). Thus while the Wisconsin Consumer Act applies to the security interest here, it would be inapplicable to the sort of property interests taken in Radford and Armstrong. Similarly, purchase-money security interests are accorded various priorities over "lien creditors" and nonpurchase-money security interests, Wis.Stat.Ann. §§ 409.301(2), 409.312(3) & (4), and may be created more easily in some instances. Wis.Stat.Ann. § 409.302(1)(d). These differences are not dispositive, but further evidence that nonpurchase-money security interests in consumer effects are not property interests whose taking must be compensated. Cf. Dames & Moore v. Regan, 453 U.S. 654, 674 n.6, 101 S.Ct. 2972, 2984 n.6, 69 L.Ed.2d 918 (President Carter's nullification of attachment of Iranian assets was not a taking because there was no "property" interest in the attachment). Indeed Justice Brandeis later disavowed the taking rationale of his Radford opinion. Wright v. Vinton Branch of the Mountain Trust Bank of Roanoke, 300 U.S. 440, 470, 57 S.Ct. 556, 565, 81 L.Ed. 736; see also Wright v. Union Central Life Ins. Co., 304 U.S. 502, 515 n.17, 517-518 n.23, 58 S.Ct. 1025, 1033 n.17, 1034 n.23, 82 L.Ed. 1490
 
 
 [11]
 At oral argument Thorp claimed that the total value of the twelve items of collateral equalled or exceeded the $3,000 loaned to the Giffords. We find that highly unlikely in view of the bankruptcy court's finding that each item was worth less than $200. Moreover, in response to questioning, counsel for Thorp conceded that debtors often exaggerate the value of their goods, or appraise the goods at replacement cost rather than what the goods might bring at a garage sale
 
 
 [12]
 See Report of the Commission on Bankruptcy Laws of the United States, H.R.Doc.No. 197, 93d Cong., 1st Sess., Part I at 169 (1973) ("The Commission is also of the opinion that nonpurchase-money security interests should not be enforceable as to items of property essential to a debtor's well-being, such as wearing apparel, which are of little or no value to a creditor, other than as a means of coercing repayment."); H.R.Rep.No. 595 at 127, U.S.Code Cong. & Admin.News 1978, p. 6088, quoted supra
 In Illinois, for example, there were 31,201 delinquent loans held by consumer finance companies during 1979 but only 25 repossessions, according to the 1980 Annual Report of the Illinois Department of Financial Institutions. See Matter of Morris, 12 B.R. 321, 350 (Bkrtcy.N.D.Ill.1981). "Such reports are not broken down between purchase-money and nonpurchase-money security interests, and it is reasonable to presume that most, if not all, of the collateral security repossessed represented purchase-money collateral." Merrick, Constitutional Chaos: Rodrock v. Security Industrial Bank & Thorp Finance Corporation v. Gifford, 2 N.Ill.U.L.Rev. 167, --- (1982).
 
 
 [13]
 Thorp is a sophisticated, commercial creditor and the new Bankruptcy Act had been in process of enactment for almost a decade until finally enacted just one month after Thorp entered the security agreement here. Quite likely there were creditors who being informed of the impending legislation perfected as many of these security interests as possible prior to enactment in the hopes of evading the new Act's lien-avoidance provisions. In Wisconsin, where this loan transaction took place, the financing statement that perfects the security interest is good for at least five years (Wis.Stat.Ann. § 409.403(2) & (3)) and the same security interest may be used to secure a series of different loans to the consumer. Wis.Stat.Ann. § 409.204(3). The particular security interest here was given "(t)o secure payment and performance of the note and all renewals and extensions and all other obligations" owed by the Giffords to Thorp. App.Doc. 1 at 6. Thus if Thorp were somehow able to exempt its lien from Section 522(f), it would be able to use the lien to secure continued lending to the Giffords for a period of four or more years after the effective date of the new Act
 The dissent suggests that the courts might avoid a pre-enactment security interest used as security for post-enactment lending on the theory that such lending creates a new security interest to which Section 522(f) is applicable. The distinction between pre- and post-enactment advances, however, is spurious. In either case, the dissent concedes that Congress may obliterate the contractual right of repayment for which the security is taken. And in either case, the "property" interest would have been created prior to enactment of Section 522(f); creditors had the same expectations under Wisconsin law of using their security interest to coerce repayment of the pre- and post-enactment advances.
 
 
 [14]
 All parties to a contract are, of necessity, aware of the existence of, and subject to, the power of Congress to legislate on the subject of bankruptcies. They were and are chargeable with knowledge that their rights and remedies, in case the debtor becomes insolvent and is adjudicated a bankrupt, are affected by existing legislation which might be enacted
 In re Prima Co., 88 F.2d 785, 788 (7th Cir. 1937). See also Wright v. Union Central Ins. Co., 304 U.S. 502, 516, 58 S.Ct. 1025, 1033, 82 L.Ed. 1490, quoting Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 435, 54 S.Ct. 231, 239, 78 L.Ed. 413:
 The mortgage contract was made subject to the constitutional power in the Congress to legislate on the subject of bankruptcies. Impliedly, this was written into the contract between plaintiffs and defendant. "Not only are existing laws read into contracts in order to fix obligations as between parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order."
 Accord, Matter of Ward, 14 B.R. 549, 562 (S.D.Ga.1981); In re Bradford, 6 B.R. 741, 744 (D.Nev.1980); Matter of Teske, 9 B.R. 18, 20 (Bkrtcy.W.D.Mich.1981); In re Schulte, 8 B.R. 12, 16 (Bkrtcy.D.Kan.1980); In re Webber, 7 B.R. 580, 584 (Bkrtcy.D.Or.1980); In re Seltzer, 7 B.R. 80, 82 (Bkrtcy.D.Colo.1980); In re Head, 4 B.R. 521, 524 (Bkrtcy.D.Tenn.1980); In re Steinart, 4 B.R. 354, 358 (Bkrtcy.W.D.La.1980). Cf. Wis.Stat.Ann. § 409.104(1) ("This chapter (regarding secured transactions) does not apply: (1) To a security interest subject to any statute of the United States * * *.").
 
 
 [1]
 In re Gifford, 669 F.2d 468 (7th Cir. 1982)
 
 
 [2]
 The Court specifically noted that the right of the mortgagee to insist on full payment before giving up his security was the "essence" of the mortgage, 295 U.S. at 580, 55 S.Ct. at 859, and that the Act as applied diminished that right by taking the following property rights under then-existing state law:
 (1) the right to retain the lien until the debt it secured is paid;
 (2) the right to realize upon the security by a judicial sale;
 (3) the right to determine when such a sale shall be held;
 (4) the right to bid in and purchase the property at the sale;
 (5) the right to control the property during the period of default.
 Id. at 594-95, 55 S.Ct. at 865-66.
 
 
 [3]
 The majority opinion thoroughly defends the section against a substantive due process attack, although Thorp has not pressed this argument on appeal. The decline of this now weak and disfavored doctrine is thoroughly documented, see, e.g., L. Tribe, American Constitutional Law, § 8-7 (1978); McCloskey, Economic Due Process and the Supreme Court, 1962 Sup.Ct.Rev. 34, and I see little point in belaboring this man of straw
 
 
 [4]
 Nor is the fact that the majority of bankruptcy courts dealing with the question have decided in favor of retrospective application. I note that fully half of those courts have found the statute unconstitutional if so applied-most without seeking an alternative, constitutionally acceptable construction
 Furthermore, none of those courts were aware, as the majority concedes, of the changes in preliminary drafts of the new Act reflecting Congressional intent to avoid the Radford problem by limiting retroactive application of the section. Finally, several of these courts were swayed by the argument that a "statutory gap" would be created if the new Act did not apply to post-enactment cases. Such a gap would only exist if a provision similar to § 522(f)(2) had existed under the old bankruptcy act. Prior to October 1, 1979, there was no such provision, however, and thus giving § 522(f)(2) prospective effect only, simply means that the power of avoiding liens under its provisions will take effect on October 1, 1979, and apply to all liens arising after that date. Liens created prior to that date will continue to be effective under state law-precisely as they were under the old Bankruptcy Act and precisely as they would be if the bankruptcy proceedings had been instituted prior to enactment of the new Act but not completed until after the effective date. I therefore decline to follow the analysis, or lack thereof, of those cases, in favor of the better-reasoned approach typified by cases such as Malpeli v. Beneficial Finance Co., 7 B.R. 508 (Bkrtcy.N.D.Ill.1980).
 
 
 [5]
 The majority characterizes this legislative history as "unconnected to any constitutional limitations upon Section 522(f)." The first references to Radford cited above occur in the Senate and House Committee Reports accompanying section 522(c), another subsection of the section containing the lien avoidance provisions at issue in this case. S.Rep.No. 95-989, 95th Cong., 2d Sess. 76, reprinted in (1978) U.S.Code Cong. & Ad.News 5787, 5862; H.R.Rep.No. 95-595, 95th Cong., 2d Sess. 361, reprinted in (1978) U.S.Code Cong. & Ad.News 5963, 6317. Section 522(c) insulates exempt property from prepetition claims with certain exceptions. The primary exceptions are tax liens, alimony and support claims, and valid liens of a prepetition creditor. In referring to this final exception, the Reports adopt the rule of Long v. Bullard, 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004 (1886), which held that a secured creditor's interest in exempt property was not disturbed by bankruptcy proceedings. The Reports cite Radford in support of the Long rule. Radford relied on Long to support its holding that the bankruptcy power does not extend to the taking of private property interests. This is hardly a "technical bankruptcy rule," as the majority suggests: rather, it is specific authority in direct support of the proposition for which it is cited above-that Congress recognized constitutional limits on its power to extinguish valid liens. It begs the question to say that because this bit of legislative history is not contained in the discussion of subsection 522(f) it is irrelevant. Delimiting our scrutiny of Congressional consideration of the limits on its bankruptcy powers to the boundaries of a particular subsection by ignoring the legislative history of a contemporaneously enacted and contiguous subsection on another aspect of the same subject (which is therefore in pari materia) does a disservice to attempts to ascertain what the Congressional intent was
 The other Congressional references to the continuing vitality of Radford occur in the Reports accompanying section 361 of the new Act, and explicitly note "the fifth amendment protection of property interests as enunciated by the Supreme Court." S.Rep. 95-989 at 49, 5835; H.R.Rep. 95-595 at 339, 6295 (citing Radford ). Section 361 deals with methods for providing adequate protection of a creditor's property interest in debtor property under subsequent sections which govern the grant of an automatic stay on proceedings against the property of the debtor; the use, sale, or lease of such property; and the trustee's use of the debtor's property to obtain credit. Again, while this section is, of course, not directly at issue here, it is in pari materia with section 522(f), and the expression of Congressional intent it evinces is relevant to the question now before us.
 
 
 [6]
 As to liens perfected between the enactment date (November 6, 1978), and the effective date (October 1, 1979) of the new Act, I would follow the reasoning of the Court of Appeals for the Ninth Circuit in Webber v. Credithrift, 674 F.2d 796 (9th Cir. 1982) (since such "gap" creditors had notice of the provisions of the new law, their property interests were subject to the lien avoidance provisions of the new Act.)
 
 
 [7]
 I simply cannot accept the majority's conclusion that this forces "significant abandonment of the Congressional purpose." The Congressional goal of providing debtors a fresh start would be limited only in those cases where the security interest attached prior to November 6, 1978, the enactment date of the new Act. Most contracts of this sort are of fairly short duration-in this case, 36 months. Thus full implementation of the Congressional goal would be delayed only in a limited class of cases, and only for a fairly brief period beyond the enactment date
 The majority suggests that because Wisconsin law permits use of the same security agreement to secure additional extensions of credit, preenactment creditors could evade the effect of § 522 indefinitely. Further extensions of credit would, however, be based on a new contractual obligation, and therefore subject to the Congress' bankruptcy power. See Kuehner, 299 U.S. at 451-52, 57 S.Ct. at 301-02. Regardless of the form of such future transactions, their effect would be to create new security interests, and as such they would be subject to § 522(f)(2), the same as any other post-enactment security interest.
 
 
 [8]
 In Loretto v. Teleprompter Manhattan CATV Corp., --- U.S. ----, 102 S.Ct. 3164, 73 L.Ed.2d 868 (U.S.1982), the Court ruled that when physical invasion, whether by the Government or a private party, rises to the level of permanent physical occupation, a per se taking violative of the Fifth Amendment has occurred and no further recourse to the factors listed in the text is necessary
 
 
 [9]
 While the majority contends that Radford has been "greatly weakened," it pointedly avoids the question whether the Radford takings holding remains intact. I am persuaded, see supra, that its authority remains valid. Rodrock, 642 F.2d 1193, 1197; Note, 94 Harv.L.Rev. at 1624; Note, 15 Ind.L.Rev. 593 passim
 
 
 [10]
 Thus a loan for seed or tools secured by a lien on real estate would result in the security interest attaching not to the seeds or tools or the fruits of their use, but rather to the land of the borrower, who may or may not use them on that property
 
 
 [11]
 The "home furnishings needed by the consumer for ordinary living" referred to in the majority opinion in this case include two television sets, a tape recorder, and an oak poker table. The characterization of these items as necessary, even in the American scene, would seem to place a tortured meaning on "needed."
 
 
 [12]
 The majority's contention that the Wisconsin state law distinction between purchase money and nonpurchase money liens is evidence that the latter are not property interests is a nonsequitur. That distinctions may be made among classes of secured creditors does not obliterate the more fundamental distinction between secured and unsecured creditors. The majority's reliance on Dames & Moore v. Regan, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), is also misplaced. Although that Court found that contingent conditional attachments did not constitute compensable property interests, it also suggested that suspension of claims, rights considerably more inchoate than Thorp's here, could give rise to a takings cause of action in the Court of Claims. Id. at 688-90, 101 S.Ct. at 2291-92; see id. at 690-91, 101 S.Ct. at 2292-93 (Powell, J., concurring and dissenting) (relying on Radford for proposition that any attachment entitling a creditor to resort to specific property for the satisfaction of a claim is a property right compensable under the Fifth Amendment)
 
 
 [13]
 My doubt stems from the likelihood that most bank officers, having an awareness of community relations, would be reluctant to put on the street a family which had been occupying the homestead. On the same basis, taking possession of the family heirloom jewelry or shares of stock, the sale of which would result in large capital gains to the registered holder, would be pursued only as a last resort. Here too, it seems, the threat of taking possession is often the true value of a lien or collateral
 
 
 [14]
 The majority opinion would discount that expectation by charging Thorp with actual knowledge of the terms of the new statute prior to its enactment. In light of the turbulent history of the drafting of the Act, which was the result of "eight years of study and debate," and an extensive "process of drafting and redrafting," In re Smith, 640 F.2d 888, 889 (7th Cir. 1981), including deletion of the only provisions affirmatively requiring retrospective application of section 522(f)(2), I find imputing such prescience unfair, even to "a sophisticated commercial creditor."
 Nor is it appropriate to say that Thorp should have been on notice at the time it entered the security transaction that its rights were contingent and subject to future changes in the law. While such reasoning might indeed be applicable to contract rights, as the cases relied upon by the majority demonstrate, secured creditors such as Thorp had every reason to believe that future bankruptcy laws not only would not, but could not, deprive them of the value of their vested property rights in specific collateral in such unprecedented fashion. The Prima case relied upon by the majority does not support its position: it involved the contractual question of reordering of priorities, not the destruction of a vested property right. Nor does the dictum from Wright v. Union Central, 304 U.S. at 516, 58 S.Ct. at 1033, provide succor to the majority position. In a later case between the same parties, the Court demonstrated that it did not mean that dictum literally when it established the rule that a secured creditor is constitutionally entitled to the value of his collateral. Wright v. Union Central Life Ins. Co., 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940); Note, 94 Harv.L.Rev., supra, at 1635 n.121.
 
 
 [15]
 As was pointed out to Congress in hearings on the new Act, one likely result of § 522(f)(2) is to dry up or increase the cost of credit to the consumer. Bankruptcy Act Revision: Hearings on H. R. 31 & H. R. 32 Before the Subcomm. on Civil & Constitutional Rights of the House Comm. on the Judiciary, 94th Cong., 2d Sess. 1256 (1976) (Statement of Robert Ward), reprinted in 5 A. Resnick & E. Wypyski, Bankruptcy Reform Act of 1978, A Legislative History at 1256; see Radford, 295 U.S. at 595 & n.27, 55 S.Ct. at 866 & n.27. Counsel for Thorp represented at oral argument that this is precisely what has happened. For preenactment debtors such as the Giffords who gave liens under the old bankruptcy code, but declared bankruptcy under the new Act, this has resulted in a windfall. They obtained the benefit of easy credit and better terms prevailing under the old Code, without putting their property at the same risk as other preenactment debtors, and they obtained the benefit of lien avoidance under the new Act without paying the same cost of credit as other post-enactment debtors. I simply cannot believe Congress intended such debtors to eat their cake and have it too in this fashion, and find this further evidence that Congress intended section 522(f)(2) to apply prospectively only
 
 
 [16]
 The fact, particularly in this era of economic distress and increasing unemployment, that the liening of household goods may be the only practicable method of borrowing by the Giffords and their ilk casts some doubt on the wisdom of section 522(f) in view of the fact that this same borrowing power has been virtually extinguished. This, however, is a matter of policy for the Congress to determine as it may well be doing in the light of some effects that the Act in application has wrought. Figures distinguishing purchase money from nonpurchase money loans are not available
 
 
 [17]
 It is thus distinguishable from the transferable development rights referred to by the majority, which the parties in Penn Central conceded had value. Penn Central, 438 U.S. at 129, 98 S.Ct. at 2661-62
 
 
 [18]
 The majority's benefits/burdens analysis simply proves too much. Every taking by the Government at least arguably redistributes the benefits and burdens of economic life. Pennsylvania Coal Co., 260 U.S. at 415, 43 S.Ct. at 160. The critical issue of when that regulation exceeds its constitutional bounds is properly determined by the Supreme Court-mandated analysis undertaken above, not by resort to the conclusory incantation of alliterative slogans